**SABINE CORPORATION, Plaintiff,**

v.

**ONG WESTERN, INC., Defendant.**

**Civ. No. 88–99–R.**

United States District Court,
W.D. Oklahoma.

Aug. 9, 1989.

Richard K. Books, David W. Simpson, Watson & McKenzie, Oklahoma City, Okl., Michael V. Powell, J. Robert Beatty, Locke Purnell Rain Harrell, Dallas, Tex., J. Randall Robinson, Patricia G. Parrish, Musser Bunch Robinson & Hirsch, Oklahoma City, Okl., for plaintiff.

Burch Bailey, David L. Kearney, Harry H. Selph, II, Terry W. Tippens, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., John L. Arrington, Jr., Thomas J. Kirby, Huffman Arrington Kihle Gaberino & Dunn, Tulsa, Okl., for defendant.

## ORDER

DAVID L. RUSSELL, District Judge.

Before the Court is the motion for partial summary judgment of Plaintiff Sabine Corporation ("Sabine"). Plaintiff seeks summary judgment on its claim against Defendant ONG Western, Inc. ("ONG") for breach of a take-or-pay gas contract for the years 1982, 1983, 1985, 1986 and 1987. Plaintiff asserts that evidence submitted by it shows there are no genuine issues of material fact concerning the existence of a contract between the parties; that Sabine had available gas to produce to ONG; that ONG refused to either take or pay for the contractually specified quantities of gas during the years in question; and the amount of damages sustained by Plaintiff as a result of ONG's failure to take or pay for gas. Additionally, with respect to Defendant's affirmative defenses, Plaintiff asserts that Defendant has not and cannot adduce facts to support certain of its affirmative defenses and that others are either inapplicable, legally insufficient or precluded by collateral estoppel. Defendant ONG, in opposing the motion, asserts that material issues of fact exist as to the amount of Sabine's damages and further asserts that all of its affirmative defenses are legally sufficient under the current status of Oklahoma law. Defendant maintains that evidence submitted by it at least raises genuine factual issues concerning the applicability of those defenses. ONG does not dispute the existence of a contract between the parties or that it neither took nor paid for the quantity of gas specified in Article IV of the contract. See Appendix to Brief of Defendant ONG in Response to Motion for Partial Summary Judgment (hereinafter "Defendant's Brief"), Exhibit "A", "Statement in Opposition to Sabine's Statement of Undisputed Facts." Rather, Defendant disputes the accuracy of Plaintiff's calculations of the minimum volumes of gas ONG was required to take under the contract, see id. at ¶ 5, and Plaintiff's figures for the volumes of gas actually purchased by ONG during the years in question. Further, in any event, ONG contends that its total take-or-pay obligation for the years in question was modified or excused by certain contractual provisions and legal defenses.

Also before the Court is Plaintiff's motion to strike the affidavits of Eddie J. Hudson, James A. Metcalf, Jr. and C.F. Hughes, Jr., filed as exhibits to Defendant ONG's response brief to Plaintiff's motion for partial summary judgment. In response to this motion ONG included supplemental affidavits of the latter two affiants. Plaintiff has objected to ONG's submission of these supplemental affidavits without having first obtained leave from the Court. ONG has responded in turn to this objection, asserting that leave was not necessary and alternatively requesting leave to file the supplemental affidavits. The Court will address the motion to strike the affidavits and objection to the supplemental affidavits hereinafter only to the extent the affidavits and/or supplemental affidavits are material to the determination of whether there is a genuine issue of material fact on a point raised by Plaintiff's motion.

### I. Force Majeure Defense

Plaintiff asserts that it is entitled to summary judgment on Defendant's affirmative defense of force majeure because 1) Defendant failed to give Plaintiff notice of a particular force majeure event; 2) Defendant has failed to allege a specific act of a

governmental body or authority which would constitute an act of force majeure and, to the extent it has alleged same, has failed to submit evidence necessary to the existence of a defense based thereon; 3) a mere price increase cannot constitute a force majeure event because Defendant assumed the risk of such increase; 4) force majeure is not a defense to Defendant's alternative mode of performance under the contract, that of paying for rather than taking gas; 5) the governmental regulation which Defendant alleges constitutes a force majeure event was foreseeable as a matter of law; and 6) Defendant cannot rely upon a "failure of markets" as a force majeure event because "failure of markets" is not an event of force majeure in the contractual force majeure clause in issue. To the extent a "failure of markets" falls within the scope of the force majeure clause in issue, Plaintiff asserts that Defendant is collaterally estopped from relying upon a mere inability to resell gas at a profit as a "failure of markets" in a force majeure clause by virtue of the determination of this issue adversely to ONG Western, Inc. in the case of *Golsen v. ONG Western, Inc.*, 756 P.2d 1209 (Okla.1988).

Defendant ONG in response contends that on May 4, 1983, it notified working interest owners of the Sarkeys No. 1–32 well, gas production from which is the subject of the take-or-pay contract in issue, that ONG had instituted ratable takes of gas under Okla.Stat. title 52, § 240, and that by letter dated November 15, 1983, ONG notified Sabine of its intent to implement the priority purchase schedule established by the Corporation Commission. Defendant asserts that the sufficiency of the notice, *i.e.*, whether these letters gave "reasonably full particulars" of the force majeure event, is a question of fact for the jury. ONG also maintains that by the express language of the force majeure clause, ONG's payment obligation is *also* excused or reduced whenever ONG is unable to take gas or is able to take only a lesser quantity as a result of a force majeure event. In this regard, ONG suggests that the force majeure clause in question should be construed in a manner analogous to the Tenth Circuit's construction of take-or-pay, force majeure and "adjustment to minimum bill" clauses in *International Minerals & Chemical Corp. v. Llano, Inc.*, 770 F.2d 879 (10th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 310 (1986). Defendant ONG further argues that it did not assume the risk of the force majeure event of intervening regulation. Assumption of the risk of a specified force majeure event is, ONG posits, logically inconsistent with the purpose of a force majeure clause, which is to shift risks and limit the parties' obligations. *See* Introductory Note to *Restatement (Second) of Contracts*, ch. 11, p. 309 (1981). ONG notes that the Uniform Commercial Code contemplates that the parties may by agreement expand the parameters of the legal excuse from performance provided in Section § 2–615. *See* Official Code Comment 8 to U.C.C. § 2–615, codified at Okla.Stat. title 12A, § 2–615. Finally, contrary to Sabine's argument, ONG argues that a force majeure event need not be unforeseeable. Relying on *Eastern Air Lines, Inc. v. McConnell Douglas Corp.*, 532 F.2d 957, 992 (5th Cir.1976) and *Atlantic Richfield Co. v. ANR Pipeline Co.*, 768 S.W.2d 777 (Tex. App.1989), it suggests that parties are at liberty to define force majeure as they wish and to include foreseeable events as events of force majeure. The sole question in ONG's view is whether the elements of the defense have been satisfied. ONG submits that because it has presented facts to support the defense, that is a jury question.

The gas purchase contract in question was entered into on March 20, 1978 by Defendant and Plaintiff's wholly-owned subsidiary whose interest in the well covered by the contract, the Sarkeys 1–32 well, was subsequently acquired by Plaintiff. The term of the contract is twenty (20) years. In precatory language, it is recited that the Seller (Sarkeys, Inc., now Sabine) is "desirous of obtaining a market for the gas produced [from its interest in the Sabine well] ... and to conserve said gas" and that Buyer (ONG) "is desirous of augmenting its supply of gas, and of conserving the gas produced and to be produced

for the benefit of its parent company's utility customers...." Gas Purchase Contract (Exhibit "A" to Plaintiff's Motion) at p. 1. The essentials of the Seller's delivery obligations and the Buyer's take-or-pay obligations are set forth in Article IV of the contract, as follows:

## ARTICLE IV

### QUANTITIES AND DELIVERIES

4.1 Seller agrees to deliver and Buyer agrees to take or pay for if tendered and not taken at the respective delivery points during each accounting year certain volumes of gas from each gas well or gas condensate well in which Seller has a working interest, completed, producible, and connected by Buyer on the lands and leases covered hereunder. Such volumes of gas required to be taken or paid for if tendered and not taken attributable to Seller's interest or interests in the mineral interests covered hereby shall be determined as follows:

A. In the absence of an applicable gas proration order established by the Oklahoma Corporation Commission or successor body having jurisdiction, the minimum yearly volume to be taken or paid for hereunder attributable to Seller's interest in each such gas or gas condensate well shall be the cumulative total for an accounting year of the daily volume of gas calculated as set forth below which represents the smallest volume of gas.

(1) *Basic Volume*—This daily volume of gas shall be Seller's percent of working interest in each such gas well or gas condensate well times ten million (10,000,000) cubic feet.

(2) *Deliverability*—This daily volume of gas shall be Seller's percent of working interest in each such gas or gas condensate well times seventy-five percent (75%) of the daily deliverability of such well. For the purposes of this contract, the "daily deliverability" of each well shall be the maximum sustainable daily volume which said well is physically and legally capable of delivering into Buyer's pipeline connec-

tion to said well, or the maximum daily volume which the well operator elects to make available for delivery into Buyer's pipeline, whichever daily volume is smaller.

B. In the event acreage attributable to gas or gas condensate wells covered hereunder becomes subject to proration by order of the Oklahoma Corporation Commission or successor body having jurisdiction, then with respect to Seller's interest in such gas or gas condensate well connected by Buyer, and subject to a proration order, Buyer's minimum yearly volume to be taken or paid for hereunder shall be the cumulative total for an accounting year of the daily volumes determined by applying for each day that one of the daily volumes of gas calculated as set forth below which represents the smaller volumes of gas.

(1) *Basic Volume*—This daily volume of gas shall be Seller's percent of working interest in each gas or gas condensate well times such well's ratable share in accordance with the proration formula of a total volume of gas equal to the total daily volume of gas committed to Buyer under this contract and contracts similar in form hereto, determined in the manner provided in subparagraph 4.1A(1) of Article IV, which is attributable to all of the gas or gas condensate wells included under the proration order.

(2) *Deliverability*—This daily volume of gas shall be Seller's percent of working interest in each gas or gas condensate well times seventy-five percent (75%) of the daily deliverability of such well, as defined in subparagraph A(2) of this paragraph 4.1.

Notwithstanding the above, it is understood and agreed that if any well covered hereunder is restricted to less than its normal allowable by the Oklahoma Corporation Commission or successor body having jurisdiction, Buyer's minimum yearly volume take-or-pay obligation shall be reduced by the difference between the volumes which Buyer under

normal circumstances would have taken from such well and the allowed production during the period that such well is so restricted.

C. It is understood that because of the nature of Buyer's market demand, Buyer may purchase larger volumes of gas than its minimum yearly volumes obligation divided by twelve (12) in some accounting months and that it may purchase limited volumes of gas in some other months. It is understood that Seller may desire to produce its wells at certain minimum daily rates to effect removal of liquids in the well producing string and/or a certain minimum monthly rate to remove any question covering the validity of Seller's lease. Seller will notify Buyer of the desired daily rate of production or minimum monthly rate of production, as the case may be, for each well covered hereby, and will give Buyer at least thirty (30) days written notice of any change therein. Upon receipt of such notice, Buyer will so schedule its monthly purchases from each well covered hereunder, to the extent operationally practical.

D. For the purpose of determining Buyer's take-or-pay obligation with respect to Seller's interest in each well covered under this contract, each gas horizon or zone separately completed and producible in each well in which Seller's interest is covered hereunder and connected or eligible for connection by Buyer shall be considered as a separate well in making the computations to determine the volumes of gas to be taken or paid for hereunder (e.g., a dual completion shall be considered as two separate wells for the aforesaid purpose).

E. Either party hereto shall have the right at any predetermined time in the presence of the other to make such tests as it deems necessary to determine the daily absolute open flow or the deliverability of any well or wells covered by this agreement. Pursuant to paragraph 4.1 of this Article IV, the calculated daily absolute open flow, if applicable, or the deliverability as determined by such tests, shall be used in the computation of the volumes of gas that Buyer is obligated to take-or-pay for attributable to the month in which the test was made, and shall likewise be used with respect to subsequent months until other tests are made. It is further agreed that the first such test performed on a well after deliveries of gas are commenced to Buyer hereunder shall be used for the computation of the volumes that Buyer is obligated to take-or-pay from such well from the date of commencement of Buyer's take-or-pay for obligation for such wells until a subsequent test is made, provided that such initial test is performed within thirty (30) days following the date of initial deliveries of gas to Buyer from such well.

F. It is agreed that in the absence of special rules established by the Oklahoma Corporation Commission, or successor body having jurisdiction, governing the production of gas or gas condensate wells covered hereunder, Buyer shall be considered as having allocated its purchases of gas ratably although it may purchase gas at varying rates from various wells or at varying rates from the same well at different times, so long as Buyer, on an annual basis, allocates its takes on the basis of that one of the following criteria which is from time to time applicable for the purpose of determining Buyer's take-or-pay for requirement with respect to each of such wells, to-wit:

(1) the percentage of basic volume for those wells for which the minimum yearly volume obligation is controlled by the basic volume, as determined pursuant to subparagraph 4.1A (1) of this Article IV.

(2) the percentage of daily deliverability for those wells for which the minimum yearly volume obligation is controlled by such well's daily deliverability.

G. Buyer agrees to take from Seller hereunder during each accounting month after deliveries of gas commence hereunder throughout each Contract Year a minimum quantity of gas which is not less than one twenty-fourth (1/24th) of the annual minimum quantity in effect for such Contract Year.

The force majeure clause, Article XVI of the contract, provides as follows:

## ARTICLE XVI FORCE MAJEURE

16.1 If either Buyer or Seller is rendered unable, wholly or in part, by force majeure or any other cause of any kind not reasonably within its control, to perform or comply with any obligations or conditions of this contract, upon giving notice and reasonably full particulars to the other party, such obligations or conditions shall be suspended during the continuance of the inability so caused and such party so rendered unable shall be relieved of liability and shall suffer no prejudice for failure to perform the same during such period, it being understood that Buyer's minimum annual obligation to take or pay for gas hereunder shall be reduced by the volume which Buyer, under normal circumstances, would have taken from the well during the period of time the inability exists; provided, obligations to make payments then due for gas delivered hereunder shall not be suspended, and in other cases, the cause of suspension (other than strikes, lockouts, or labor disputes) shall be remedied insofar as possible with reasonable dispatch. Settlement of strikes, lockouts, and labor disputes shall be wholly within the discretion of the party having the difficulty. The term "force majeure" shall include, without limitation by the following enumeration, acts of God and of the public enemy, the elements, freezing of wells or lines of pipe, repairing or altering machinery or lines of pipe, fires, accidents, breakdowns, strikes, labor disputes, and any other industrial, civil or public disturbance, inability to obtain materials, supplies, rights-of-way on customary terms, permits, or labor, any act or omission by parties not controlled by the party having the difficulty, any act or omission (including failure to take gas) of a purchaser of gas from Buyer which is excused by any event or occurrence of the character herein defined as constituting force majeure, failure of gas supply, and any laws, orders, rules, regulations, acts, or restraints, of any governmental body or authority, civil or military, or any other causes beyond the control of the parties hereto. If, in the event Buyer is prevented from purchasing gas from Seller for a continuous period of one year as a result of force majeure, then Seller may terminate this contract and dispose of the remaining gas to other purchasers.

In its Answer to the First Amended Complaint, ONG alleges that "[a]ny unfulfilled take-or-pay obligations which ONG may have under the Contract for the contract years 1982 through 1987 were suspended by force majeure, including actions of regulatory agencies, or such other cause of [a] nature not reasonably within ONG's control," Answer of Defendant ONG Western, Inc. to First Amended Complaint ¶ 26, p. 13, including a combination of the following events, which ONG alleges resulted in "a substantial disappearance of ONG's markets for natural gas, as well as the markets for natural gas of those who customarily purchased natural gas from ONG," *id.* at ¶ 14, p. 6:

1) Drastically increased natural gas prices were required to be paid to producers in the field as a result of enactment of the Natural Gas Policy Act of 1978;

2) Conservation efforts by and fuel switching capabilities of natural gas consumers increased;

3) Discoveries of new supplies of natural gas and deliverability from such supplies increased;

4) The world-wide price of crude oil and crude oil products drastically declined;

5) Economic activity in the nation, and particularly Oklahoma, severely declined,

and to the present time has not recovered in Oklahoma;

6) A large surplus of natural gas developed; *and*

7) Unforeseen regulatory changes occurred which, together with development of a gas "spot market" (a market for gas not committed to long-term gas purchase contracts) for cheaper gas drastically increased gas-to-gas competition, both nationally and in Oklahoma. *Id.* at ¶ 14, pp. 5–6.

ONG further alleges that "[a]s a necessary consequence of the failure of ONG's markets" due to a combination of the above-described unforeseen events, "ONG's markets would not permit the purchase of the specified volumes of gas ... under the Contract during the contract years 1982 through 1987, without unlawful discrimination against ONG's other suppliers of gas, which condition continues to the present date." *Id.* at ¶ 14, p. 6.

In response to Plaintiff's motion for partial summary judgment as directed to this affirmative defense, Defendant submits the affidavit of C.F. Hughes, Jr., a registered petroleum engineer in Oklahoma who is currently employed as a consultant in natural gas marketing, was formerly Vice President–Gas Supply of both Oklahoma Natural Gas Company and of ONG Western, Inc. from October 1, 1979 to September 1, 1986 and previously thereto was Manager of Gas Supply and Reserves for ONG. *See* Affidavit of C.F. Hughes, Jr. (Exhibit "H" to Defendant's Brief) at ¶¶ 1 & 4 and Supplementary Affidavit of C.F. Hughes, Jr. at ¶¶ 1 & 4.[1] Mr. Hughes states that he was responsible for the negotiation of the gas purchase contract in question and all similar gas purchase contracts then being entered into by ONG. *Id.* at ¶ 6. Mr.

Hughes describes the effect of various regulatory actions on the supply, demand and price structure of gas in both interstate and intrastate markets, including Federal Power Commission regulation of producer wellhead pricing for sales in interstate commerce, allegedly in response to *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954); the Natural Gas Policy Act of 1978, imposing price controls on "old gas" sold in interstate commerce but not that sold in intrastate commerce, and removing price restrictions on narrow categories of gas; and FERC Order No. 436, which he contends "virtually forced interstate pipelines to implement transportation programs," affecting the ability of ONG, which is an intrastate pipeline, to compete with interstate pipelines for gas.

Before 1979, and in March of 1978 when the gas purchase agreement in question was entered into, Hughes attests:

[I]n order to obtain the gas supplies needed by ONG to meet the cold weather peak demand requirements of its utility customers, as such new supplies were discovered and developed, ONG was required to agree to higher level takes, approaching those of the interstate pipelines. ONG was also required to agree to include in its contracts provisions ("favored nation" or indefinite price escalation ("IPE") clauses) providing that ONG would adjust the price being paid in the area to insure that the producer would receive the current market value for its gas. However, the quantity (take-or-pay) provisions in ONG's contracts were intended to reflect the industry-accepted eventualities of minor annual take fluctuations related to weather and economic developments, or simply oversight in not

---

1. The Hughes Affidavit, at least when deemed amended by the Supplemental Affidavit, *see* Exhibit "C" to Brief of Defendant in Opposition to Motion to Strike, shows that the affidavit is made on personal knowledge, Hughes Affidavit at ¶ 1, and sets forth facts showing that the affiant has personal knowledge based on his positions with Oklahoma Natural Gas Company and ONG Western, Inc., *see* Hughes Affidavit at ¶ 1 and Supplemental Hughes Affidavit at ¶¶ 1 & 4, and his duties in those positions, *id.* at ¶ 4; *id.* at ¶¶ 2–4. To the extent leave is required for the filing of the Supplemental Hughes Affidavit, leave is granted. However, the Court agrees with Plaintiff that Mr. Hughes does not have personal knowledge and is not competent to testify concerning *Sabine's* understanding or basic assumptions of the contract. Statements contained in Mr. Hughes' affidavit, as they pertain to Sabine's assumptions and understandings only, will be disregarded and deemed stricken. *See* Hughes Affidavit at ¶¶ 7 & 19.

turning on particular fields, and had functioned in that manner for many years, with ONG making such payments on occasion, and then readily making them up by takes in excess volumes in subsequent years. Similarly, the "favored nation" and IPE clauses merely tracked new prices paid in the unregulated free Oklahoma intrastate market; the regulated, below-cost interstate prices were never a factor. *Id.* at ¶ 17.

Also prior to 1979, according to the affiant, ONG had been able to "dispose of the deliverability under its contracts which was not required by its utility customers to large Oklahoma industrial customers or to interstate pipelines to serve their always gas supply-starved markets." *Id.* at ¶ 18. After the NGPA, according to the affiant, interstate pipelines, which were previously gas-starved, "were bidding up the prices of gas in Oklahoma to astronomical levels, far above the actual market value of gas in the field" with the result that

> ONG, whose favored nation clauses had been entered into when triggering prices were determined by the Oklahoma intrastate free market (the lower regulated interstate prices were never a factor), was thereby forced to pay the same prices for gas from wells newly drilled on acreages subject to the old, pre-NGPA contracts, as the interstate pipelines were paying for new supplies of gas. *Id.* at ¶ 22.

Then the affiant describes a "market collapse" which allegedly occurred in 1982. During this collapse, according to the affiant, ONG's interstate pipeline customers began to rapidly lose their markets for their high-priced gas as fuel switching resulting from a decline in oil prices, conservation measures and the effect of an economic recession took effect. *Id.* at ¶ 23. This purportedly led to the interstate pipelines' drastic reduction of purchases from ONG to reduce the pipelines' liabilities under their own take-or-pay contracts. Finally, the affiant maintains that

> "As the FERC-encouraged and subsequently mandated transportation programs began to take effect, shut-in cheap spot market gas from producing

areas such as Oklahoma not only displaced such interstate pipelines' own contracted system supply, *but ended any hope ONG had for resuming interstate sales, since its own cost of gas under its old contracts, escalated by favored nation clauses, was substantially above the free market price for gas in the field. Id.* (emphasis added).

The "bottom line," according to the affidavit, is that the price of gas under ONG's contract with Sabine remained at the highest price paid in the area, while the market price declined substantially, *id.* at ¶ 24, with the spot market price for gas in the field currently $1.40 per MMBtu, *id.* at ¶ 19 & 26, as compared to $3.812 per MMBtu, what Defendant contends Plaintiff claims is the present price operative under the contract in question. *Id.* at ¶ 19. The effect of this price differential, according to the affiant, is that interstate and unregulated competing Oklahoma intrastate pipelines are able to take advantage of the low spot market price and to supply industrial customers which were previously ONG customers, thus eliminating *"a major portion of ONG's sales of natural gas," id.* at ¶ 26, and rendering ONG incapable of taking all of the contractually provided volumes of gas under take-or-pay contracts like the present one. *Id.* at Z¶ 27. Mr. Hughes also mentions Oklahoma Corporation Commission priority rules embodied in Rule 1–305 requiring pipelines to allocate their market demand and suggests that ONG was required to reduce its takes from the Sarkeys well pursuant to these priority rules.

■ Assuming without deciding that one or more of the "events" described in Mr. Hughes' affidavit, or a combination thereof, may be within the contemplation of the force majeure clause, a threshold issue is presented as to whether Defendant gave the contractually-required notice of such event or events. The failure to give proper notice is fatal to a defense based upon a force majeure clause requiring notice. *See International Minerals & Chemical Corp. v. Llano, Inc.,* 770 F.2d at 885; *Resources Investment Corp. v. Enron Corp.,* 669

F.Supp. 1038, 1043–44 (D.Colo.1987); *Superior Oil Co. v. Transco Energy Co.*, 616 F.Supp. 98, 108–09 (W.D.La.1985).

■ ONG relies on statements of C.F. Hughes, Jr. that ONG notified working interest owners in the Sarkeys well on May 4, 1983 that it had instituted ratable taking and that it notified Plaintiff on November 15, 1985 that it was implementing a priority purchase schedule in accordance with Oklahoma Corporation Commission Rule 1–305. The gas purchase agreement in question, however, requires that every notice provided for in the contract be in writing and mailed to each party's specified address *see* Exhibit "A" to Plaintiff's Motion at ¶ 23.4. The affidavit is not sufficient to show written notice. However, ONG also relies on unauthenticated copies of letters included as Exhibits "P" and "Q" to its Brief in Response to Plaintiff's Motion for Partial Summary Judgment. Since these documents would appear to be business records of Defendant, admissible at trial through a witness who could properly lay the foundation for their admissibility and authenticate them, the Court will consider these documents in determining whether there is a genuine factual issue concerning notice of a purported force majeure event or events. Exhibit "P" is a letter dated March 4, 1983 from Oklahoma Natural Gas Company to Inexco Oil Co., the operator of the Sarkeys well. Nowhere does the letter indicate that a copy thereof was sent by ONG Western, Inc. to Sarkeys, Inc., Plaintiff's predecessor or Plaintiff. No material issue of fact is created concerning notice to Plaintiff on May 4, 1983 of a force majeure event as required by the contract. Exhibit "Q," however, shows that a copy of this letter from Oklahoma Natural Gas Company dated November 15, 1983 was sent to Plaintiff. Accordingly the Court examines such written notice to determine whether a jury could reasonably find that the letter provided "reasonably full particulars to the other party" that the Buyer was "rendered unable, wholly or in part, by force majeure or any other cause not reasonably within its control, to perform or comply with any obligations or conditions" of the contract. Literally read, the letter gives notice that ONG Western, Inc. will be required to implement a priority purchase schedule in accordance with Oklahoma Corporation Commission Rules as of January 1, 1984 and requests that operators of Priority Four wells furnish ONG with copies of 1983 open flow potential tests on file with the Corporation Commission and that operators also notify ONG of Orders of the Corporation Commission establishing their wells' status qualifying them for Priority One, Two or Three. It does not unequivocally state that ONG Western, Inc.'s supply exceeds its market demand and that curtailments are necessary, but this is at least a reasonable inference from the notice. Nor does the notice state what amount of curtailment is necessary. But whether this notice contains "reasonably full particulars" of a force majeure event or a partial inability to perform by virtue of Oklahoma Corporation Commission Rule 1–305 and/or a decline in market demand, *assuming* such events fall within the force majeure clause, is a question of fact for the jury.

■ Plaintiff's argument that an alleged act of force majeure does not relieve ONG of its alternative obligation to pay for gas not taken, whatever its viability may be with respect to this defense of commercial impracticability, must be rejected as to this defense. The force majeure clause, as Defendant suggests, unambiguously excuses both the obligation to take and the obligation to pay when gas cannot be taken for a reason within the clause.

In so concluding, the Court is aware that the Tenth Circuit in *International Minerals & Chemical Corp. v. Llano, Inc.* construed a similar force majeure clause and an "adjustment of minimum bill" clause in a take-or pay contract in a manner *consistent with and by reference to* the doctrine of commercial impracticability, to the effect that a force majeure event—complete or partial inability to perform or comply with any obligations or conditions of the contract as a result of force majeure or any other cause beyond the party's reasonable control—excuses taking but not paying. It logically follows that that Court would require that a party be *both* unable to take

*and* unable to pay before the force majeure and "adjustment to minimum bill" provisions would have *any* effect. This Court cannot conceive of any event or cause within the contemplation of the force majeure clause which would render a party unable to pay. Thus, it would appear that such a construction might render the force majeure clause nugatory. Conversely, if a party is rendered only unable to take as a result of a cause or occurrence defined in the force majeure clause and such party is not then excused from paying, the force majeure clause has no effect; if the clause were removed from the contract, application of the take-or-pay clause *alone* would yield the same result.

■ Plaintiff's argument that an event of force majeure must be unforeseeable must be rejected. Nowhere does the force majeure clause specify that an event or cause must be a unforeseeable to be a force majeure event. The focus of the clause is upon a party's ability to control rather than its ability to foresee the alleged cause.

■ Plaintiff argues that ONG has failed to allege any act of a governmental body or authority which would constitute an act of force majeure and, to the extent it has alleged such an act, has failed to submit evidence necessary to the existence of a defense predicated on the force majeure clause, and that a mere price increase cannot constitute force majeure because Defendant assumed the risk of such increase. Both of these arguments depend to a lesser or greater extent on interpretation of the force majeure clause in issue. Although ONG invokes in its pleading and in evidence submitted in response to Plaintiff's motion a plethora of statutes, regulations and orders which singly or in conjunction with each other purportedly rendered ONG unable to take gas during the year in question, the only law or rule of a governmental body which ONG asserts constitutes or is a basis for a force majeure event of which Defendant arguably gave Plaintiff notice, see above, is Rule 1–305 of the Oil and Gas Rules of the Oklahoma Corporation Commission. That Rule by its terms *permits*

*rather than requires* a purchaser to reduce its takes when permitted production from all wells in a common source of supply from which a purchaser is required to take exceeds that purchaser's market demand. In the event a purchaser *elects* to reduce its takes from wells within a common source of supply, the Rule does require that the reduction be made according to the priority schedule set forth in subsection B and that any reduction in taking from wells *within* a given priority be done ratably among those wells, *see* O.C.C. O & G Rule 1–305(C); *Golsen ONG Western Inc.*, 756 P.2d at 1219. Thus, Rule 1–305, although a rule of a governmental body or authority and therefore a "force majeure" within the meaning of the force majeure clause, did not and can not render ONG *unable* to perform any, i.e. either, of its obligations under the contract when (if) its market demand was less than production it was required to take from all wells within the same source of supply with the Sarkeys well. The force majeure clause in the contract is only operative if a party "is rendered unable, wholly or in part, by force majeure or any other cause not reasonably within its control, to perform or comply with any obligations or conditions" of the contract. Of course, if ONG sought to avoid the consequences of an election not to reduce takes from the Sarkeys well commensurate with its market demand, that is, of also not reducing takes from other wells in the same source of supply, Defendant could opt to reduce or cease takes from the Sarkeys well (which would permit it to reduce or cease taking from other wells in the common source of supply in accordance with Rule 1–305) and pay any deficiencies.

Secondly, Defendant ONG has not offered any competent evidence that the total permitted production from wells within the common source of supply in which the Sarkeys well is exceeded ONG's market demand during the years in question. *Compare with* Affidavit of C.F. Hughes (Exhibit "H," Appendix to Defendant's Brief) at ¶ 25 and Exhibit "Q," Appendix to Defendant's Brief. Mr. Hughes' statements to the effect that Defendant ONG experienced a drastic but unquantified overall

decline in market demand; that in response thereto ONG notified Sabine and all other operators that it was implementing the priority purchase schedule specified in Rule 1–305; and that thereafter it reduced its takes from the Sarkeys well are at best a scintilla of evidence that Defendant ONG's market demand was less than the total permitted production from the Sarkeys well and those other wells within the same common source of supply from which ONG was required to take. This is not enough to preclude summary judgment on the existence of a force majeure event, even if Rule 1–305 were construed or mandatory rather than permissive, i.e., to require a purchaser's reduction of takes at any time the purchaser's market demand for gas from a common source of supply was less than permitted production from such source which that purchaser was obligated to take. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202, 213–14 (1986); *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir.1989).

Even assuming that the notice of November 15, 1983 were sufficient to invoke the force majeure clause based on a decline in or failure of market demand due to any or all of the various events or causes alleged by ONG to constitute events of force majeure, ONG's force majeure defense based upon such other causes is legally insufficient because ONG has failed to submit any evidence showing that any or all of these alleged force majeure events rendered ONG *unable* to take gas within the meaning of the force majeure clause. At best, ONG's evidence demonstrates that the effect of the various alleged events of force majeure was a decline in market demand and a disparity between ONG's contract price and the market price or value of gas, *see* Affidavit of C.F. Hughes, Jr. (Exhibit "H," Appendix to Defendant's Brief) at ¶¶ 19, 23, 26 & 27, with the result that if ONG were to have taken the gas, it would have had to resell it at a loss. *See id.* at ¶ 27. Such a loss of market demand which, as opposed to absolute demand, is a function of price, *see Golsen v. ONG Western,*

*Inc.*, 756 P.2d at 1213 n. 2, and the inability to resell gas at a profit, does not render a party "unable" to take gas. *See Golsen v. ONG Western, Inc.*, 756 P.2d at 1213 (interpreting force majeure clause extending to "failure of gas supply or markets"); *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d at 566. While the Court agrees with Defendant that the purpose of a force majeure clause is to shift risks otherwise assigned and limit the parties' obligations under a contract, *see* Introductory Note to *Restatement (Second) of Contracts* ch. 11, p. 309 (1981), ascribing such a purpose to the force majeure clause in question cannot alter the plain and unambiguous meaning of the term "unable." And just as the Court has rejected an interpretation of the force majeure clause which would render *it* nugatory, the Court must reject an interpretation of the force majeure clause which would render the take-or-pay and price redetermination provisions, pursuant to which Defendant ONG clearly assumed the risk of a decline in market demand and market price, *see Golsen v. ONG Western, Inc.*, 756 P.2d at 1213–14; *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d at 566; *Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.*, 813 F.2d 77, 80 (5th Cir.1987), nugatory. *Cf. Golsen v. ONG Western, Inc.*, 756 P.2d at 1213–14 (construction of "failure of market" urged by defendant would negate lengthy and detailed price redetermination and take-or-pay provisions). Thus, even if the term "unable" as used in the force majeure clause in question was reasonably susceptible to the interpretation Defendant implicitly urges, the Court's task of construing the force majeure clause in conjunction with the entire contract, each clause helping to interpret the others, and giving effect, whenever practicable, to each clause, *see* Okla.Stat. title 15, §§ 157, 166 & 168; *Golsen v. ONG Western, Inc.*, 756 P.2d at 1214; *Mercury Investment Co. v. F.W. Woolworth Co.*, 706 P.2d 523, 529 (Okla.1985); *Shepherd v. French*, 612 P.2d 727, 729 (Okla.App.1980); *see also Ferrell Construction Co. v. Russell Creek Coal Co.*, 645 P.2d 1005, 1007 (Okla.1982); *Walker v. Telex Corp.*, 583 P.2d 482, 485 (Okla.

1978) (construction of ambiguous contract is a matter of law for the court); would mandate rejection of an interpretation that "unable to perform" as used in the force majeure clause means "unable to perform except at a loss." *Cf. Golsen v. ONG Western, Inc.*, 756 P.2d at 1214 (a clause will not be accorded a meaning which negates or is in conflict with major portions of a contract or is contrary to the parties' general intent); *Mercury Investment Co. v. F.W. Woolworth Co.*, 706 P.2d at 529 (terms in contract given their plain and ordinary meaning unless used by parties to convey a technical sense); Okla.Stat. title 15, § 160 (same). *But cf. International Minerals & Chemical Corp. v. Llano, Inc.*, 770 F.2d at 886 (applying New Mexico law).

■ Finally, with respect to ONG's affirmative defense based on the force majeure clause, Plaintiff argues that ONG is somehow collaterally estopped from alleging that failure of markets was a force majeure event. Plaintiff's argument *in fact* makes a case for the *inapplicability* of any issue preclusive effects of the *Golsen* court's holding concerning what does not constitute a "failure of markets" as that term was used in the contract at issue therein and at once makes a purely contract-based argument:

> Unlike *Golsen,* where the Oklahoma Supreme Court held that the term "failure of markets" in a force majeure provision did not authorize relief from performance, the force majeure clause of the contract [in issue] does not even contain a "failure of markets" provision. Brief in Support of Plaintiff's Motion for Partial Summary Judgment (hereinafter "Plaintiff's Brief) at pp. 32–33 (emphasis added).

Defendant herein is not and could not rely on a non-existent "failure of markets" provision in the force majeure clause, but that

has nothing to do with collateral estoppel. To the extent some decline in market demand is integral to ONG's force majeure defense, whether as a result of a governmental regulation or *as* a "cause of any kind not reasonably within its control," collateral estoppel is unapplicable because of a lack of identity of issues. *See Anderson v. Falcon Drilling Co.*, 695 P.2d 521, 526 (Okla.1985); *Kelley v. Kelley*, 447 P.2d 774 (Okla.1968). The issue determined in the *Golsen* case was whether decline in market demand and inability to resell gas at a profit constituted a "failure of markets" as the term was used in the force majeure clause in that case. Even if a decline in market demand and inability to resell gas at a profit are integral to or constitute the basis of ONG's force majeure defense herein, the issues presented in this case are whether that decline and inability or that which allegedly caused them fall within the events or causes defined in the force majeure clause within the contract in *this* case, which force majeure clause is different from that in the *Golsen* case and, if so, whether such events or causes rendered ONG "unable, wholly or in part, ... to perform." [2]

## II. *Commercial Impracticability/Impossibility of Performance*

■ A second affirmative defense asserted by ONG on which Plaintiff moves for summary judgment is that of commercial impracticability. Initially, Plaintiff Sabine asserts that the undisputed fact that Defendant ONG actually recouped a 1979 payment for a 1978 deficiency by taking more than the minimum purchase amount of gas in 1984 somehow defeats the defense of commercial impracticability or equitably estops ONG from asserting it and undermines ONG's credibility. This evi-

---

**2.** While it may be inferred from the *Golsen* decision that the Oklahoma Supreme Court would reject an interpretation of "unable, wholly or in part ... to perform" which would encompass a mere failure in market demand and inability to resell gas at a profit, *see* 756 P.2d at 1213, the court in *Golsen* never reached this issue and hence did not actually and necessarily determine this issue. It determined only that a

decline in market demand and inability to resell gas at a profit did not constitute a "failure of markets," "wholly or in part." *Id.* Having concluded that the force majeure event of "failure of markets" did not occur, it was unnecessary for the court to reach and the court did not reach the issue of whether ONG Western, Inc. was rendered unable, in whole or in part, to perform by reason of a force majeure event.

dence of ONG's ability to take or pay for gas in 1984 does not establish, as a matter of law, that taking or paying for gas in the years in question was not commercially impracticable for ONG. Plaintiff's motion for partial summary judgment is directed to its claim against Defendant ONG for breach of the contract only for the years 1982, 1983, 1985, 1986 and 1987.

Plaintiff next urges that Defendant is collaterally estopped, by virtue of a determination adverse to it in *Golsen v. ONG Western, Inc.*, 756 P.2d 1209, "from relitigating the fact that 'failure of markets' is simply failure of a market at the contract price.'" Plaintiff's Brief at p. 18. Sabine suggests that ONG's commercial impracticability defense is a "thinly disguised attempt to relitigate in this forum an issue that was necessarily decided ... in *Golsen*," which Sabine explains this way:

> In *Golsen*, the Oklahoma Supreme Court held that as a matter of law, the trial court's finding of a "failure of markets" was merely a finding "that no market exists ... for gas at or above ONG's contract price." Golsen at 1213. The Court went on to hold that this finding was fatal to ONG's force majeure defense, and this finding is equally fatal to ONG's commercial impracticability/impossibility defense asserted herein." *Id.* at pp. 19–20.

Sabine proceeds therefrom to assert that the Oklahoma Supreme Court recognizes the "viability" of nonmutual offensive collateral estoppel and that all of the elements necessary for application of that doctrine are present. *Citing Veiser v. Armstrong*, 688 P.2d 796, 800 n. 9 (Okla.1984), Sabine contends that the fact that the defense of impracticability is different than the defense of force majeure rejected in the *Golsen* case is immaterial, because collateral estoppel bars relitigation of a factual issue common to a different theory.

ONG in response suggests that the Oklahoma Supreme Court has not endorsed the offensive use of collateral estoppel; that Sabine has not demonstrated that the precise issue(s) in this action were in fact determined in a prior action; and that

ONG's impracticability defense is not based on failure of markets.

It appears that Plaintiff misunderstands or mischaracterizes the trial court's and Oklahoma Supreme Court's findings and conclusions in the *Golsen* case. The trial court's conclusion that a "failure of markets" as that term was used in the force majeure clause did occur was based upon its findings of a severe decline in ONG's market demand and of a consequential inability to sell gas at a profit. The Oklahoma Supreme Court accepted the findings of a decline in ONG's market demand and its inability to sell gas at a profit but held that those findings were legally insufficient to constitute the force majeure of "failure of markets." Sabine seemingly attempts to restate the issue decided in *Golsen* in the converse, that is, that "failure of markets" can never be anything more than a mere decrease in market demand and inability to resell at a profit and therefore, that "failure of markets" can never relieve a party of its obligations under a take-or-pay contract. In this case ONG is not attempting to establish a "failure of markets." The Court agrees with Sabine that Defendant's commercial impracticability defense depends upon a decline in market demand and inability to resell gas at a profit (which are the effects of an disparity between the contract price and the market price or value). Moreover, the Court notes that in interpreting "failure of markets" as used in the force majeure clause and in determining whether a decline in market demand and inability to resell gas at a profit could constitute "failure of markets," the court in *Golsen* looked in part to the doctrine of commercial impracticability and interpreted "failure of markets" in a manner consistent with that doctrine. However, the court in *Golsen* never actually and necessarily decided whether a decline in market demand and the inability to sell gas at a profit or a disparity between the contract price and the market price or value constitutes commercial impracticability. Hence, the *Golsen* decision can have no issue preclusive effect on Defendant's defense of commercial impracticability herein and cannot be employed by Plaintiff to collaterally

estop Defendant from litigating whether a decline in market demand and inability to resell gas at a profit or a disparity between the contract price and market price or value constitutes commercial impracticability. *See e.g., Anderson v. Falcon Drilling Co.*, 695 P.2d 521, 526 (Okla.1985). Thus, it is unnecessary for the Court to reach Sabine's other arguments directed to the issue of collateral estoppel.

Finally, Plaintiff argues that Defendant cannot, as a matter of law, establish the elements of the impracticability defense asserted because both of ONG's obligations are not impracticable, mere financial loss is not commercial impracticability and ONG assumed the risk of increases in price and decreases in demand.

In response to Plaintiff's argument directed to the alternative nature of Defendant's obligations under the contract, Defendant asserts that "the extreme increase in the cost of ONG's performance renders both the obligation to *take* the high priced gas under the contract or the "alternative" obligation to *pay* for it anyway if not taken, impracticable to perform." Defendant's Brief at p. 19.

■■■■■ Section 2–615 of the Uniform Commercial Code, codified at Okla.Stat. title 12A, § 2–615, which applies to a contract for the delivery of natural gas, *see Golsen v. ONG Western, Inc.*, 756 P.2d at 1220 (Kauger, J. and Opala, J. concurring), requires that a party asserting the defense of commercial impracticability establish that 1) it did not, by the terms of its contract, assume a greater obligation than is ordinary; and 2) its performance was made impracticable by the occurrence of a contingency or condition, the non-occurrence of which was a basic assumption of the contract. *See* Okla.Stat. title 12A, § 2–615(a); *Golsen v. ONG Western, Inc.*, 756 P.2d at 1221. A judicially-required third element for relief on the basis of commercial impracticability is that the occurrence making performance impracticable must have been unforeseeable. *Golsen*, 756 P.2d at 1221; *see also Bernina Distributors, Inc. v. Bernina Sewing Machine Co.*, 646 F.2d 434, 439 (10th Cir.1981)

(foreknowledge of possibility of currency fluctuations), *clarified at* 689 F.2d 903 (10th Cir.1981). Moreover, increased cost of performance will not excuse performance unless it is due to an unforeseen contingency which alters the essential nature of the performance. *See Golsen v. ONG Western, Inc.*, 756 P.2d at 1213, *citing* Uniform Commercial Code Comment 4 to Section 2–615, Okla.Stat. title 12A, § 2–615 and *Restatement of Contracts* § 455 (1932).

■■■■■ In this case, ONG does not argue that the governmental regulation or deregulation of natural gas was unforeseeable; rather it argues that the unforeseen contingency was the *result* of the regulation—an extreme deviation between the contract price and the market value of gas and the financial hardship to ONG which will result. *See* Defendant's Brief at pp. 13, 19, 20–21. ONG argues that this extreme unforeseeable price differential altered the basic assumption of the contract because "the nonoccurrence of an extreme deviation in the contract price and market value of gas was a basic assumption of the parties." *Id.* at p. 22.

The contract in question provides that in the absence of an agreed redetermined contract price for each subsequent accounting year, the price for each accounting year would be redetermined, *see* Gas Purchase Contract (Exhibit "A" to Plaintiff's Motion) at Art. XIV, ¶ 14.1C, p. 19, as a price

equal to the highest price being paid during any one of the ninth (9th), tenth (10th) and eleventh (11th) accounting months of the accounting year immediately preceding the accounting period for which the redetermination is proposed for gas then being purchased in Beckham, Washita, Custer, and Roger Mills counties, Oklahoma, by any pipeline company or public utility that purchased an average of 200 million cubic feet of gas per day in the state of Oklahoma during the accounting year immediately preceding the accounting period for which the redetermination is proposed, which pipeline or public utility is then purchasing gas in one or more of the aforesaid coun-

ties. In selecting such price, there shall be considered only such contract arrived at as a result of arm's length, good faith bargaining between producers which have no direct or indirect affiliation or special relationship with the purchaser being considered, and prices being paid under contract covering pipeline sales by or between transmission companies shall not be considered. *Id.*

This provision negates the possibility that a basic assumption of the contract was that there not be a differential between the contract price and the market price. Indeed, the fact that this price redetermination clause ties the contract price to the *highest price* then being paid in a four-county area indicates that ONG at all times assumed the risk that this price would be above the market value or market price *at any time that there is a variance in prices paid for gas within the four-county area,* notwithstanding Mr. Hughes' statement that such price escalation clauses were "included to insure that the producer would receive the current market value for its gas." Hughes Affidavit at ¶ 9. *See* also ¶ 14 ("[N]o one had ever contemplated that the effect of the price redetermination clause in ONG's pre-NGPA contracts would require ONG to pay *more* than the current market value of the gas."); ¶ 7 ("It was a basic assumption of the parties that Sabine should receive market value for its gas and the parties inserted a price redetermination provision in the contract for that purpose.")

ONG, however, nevertheless argues that the non-occurrence of an *extreme* deviation in contract price and market price was a basic assumption of the parties in contracting. The problem with this argument is that it advocates inconsistent inferences about basic assumptions on which the contract was made.

If the non-occurrence of a disparity between the contract price and the market price or value could not have formed a basic assumption of the contract because the risk of such occurrence was assumed by the buyer, then the non-occurrence of an extreme disparity cannot have been a basic assumption of the contract. While con-

tracting for the purchase of gas at a fixed price subject to price redetermination based on the highest price then paid in a four-county area, and thus having assumed the very type of risk which is asserted to be an unforeseen contingency, ONG cannot argue that it did not assume the *degree* of risk which the alleged contingency brought to bear.

However, even if the non-occurrence of a disparity of this magnitude between the contract price and the market price or value is accepted as a basic assumption of the contract, the defense of commercial impracticability with respect to the payment obligation fails for another, more basic, reason. Defendant ONG has failed to submit competent evidence to create a genuine factual issue as to whether its performance by payment is commercially impracticable.

To show that performance of the take-or-pay contract by payment is impracticable, even assuming that the other elements of commercial impracticability are satisfied, ONG has the burden of submitting evidence from which a jury could conclude that ONG's performance of the contract by payment would require *unreasonable* expense. *See Golsen v. ONG Western, Inc.,* 756 P.2d at 1221.

> In order to meet the requirement of unreasonable expense a mere showing of loss under the contract is insufficient. To qualify, the applicant must show extreme, not merely unreasonable expense. Even those who criticize application of the defense to typical take-or-pay contract provisions recognize it may be applicable where the general financial health of the purchaser is threatened. *Golsen v. ONG Western, Inc.,* 756 P.2d at 1221.

ONG asserts that it meets the criteria established in *Golsen* for commercial impracticability of the payment obligation because payment of the potential take-or-pay liability would result in extreme financial hardship to "ONG" and the ratepayers of Oklahoma, and would threaten the overall financial health of ONEOK and would result in "grave injustice."

ONG's evidence that its *parent corpora-tion's* overall financial health [3] would be threatened by payment of potential take-or-pay liabilities of the parent, ONEOK, Inc., its division, Oklahoma Natural Gas Company, and of ONG Western, Inc. through August 31, 1988, offered through the affidavit of James A. Metcalf, Jr., Vice President–Controller and Chief Accounting Officer of Oklahoma Natural Gas Company, a division of ONEOK Inc., does not create a material factual issue as to whether the overall financial health of ONG Western, Inc. is threatened by performance through payment of the take-or-pay contract at issue in this case because it is not competent to that issue and it is not presented in a form which would permit one to ascertain or infer the effect of ONG Western, Inc.'s performance by payment of the contract in question on *that* corporation's overall financial health. Similarly, evidence of the effect of payment of all of the potential take-or-pay liabilities of the parent, ONEOK Inc., its utility division, Oklahoma Natural Gas Company, and of its wholly-owned subsidiary, ONG Western, Inc., the subsidiary which is the Defendant herein, upon the utility ONG's ratepayers suffers from the same defect and from the *additional* defect that it is *wholly irrelevant* to the issue in question.

To the extent that ONG relies on this evidence to show that failure to excuse performance by the alternative mode of payment would result in "grave injustice," *see* Defendant's Brief at p. 15, *citing Llano* at 886 and *Golsen* at 1221, the evidence is not competent for essentially the same reason—it is not competent on the issue of the effect of performance of the contract in question on the obligor's overall financial health. Whether "grave injustice" would result from failure to excuse performance is merely an inquiry used to assess whether the cost *to the contracting party of performing the contract* is so excessive and unreasonable as to warrant the conclusion that performance has become impracticable. *See Gulf Oil Corp. v. Federal Power Commission,* 563 F.2d 588, 599 (3rd Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978), *cited in International Minerals & Chemical Corp. v. Llano, Inc.,* 770 F.2d at 886. *See also* Introductory Note to ch. 11, *Restatement (Second) of Contracts* (1981) at pp. 309–10.

That brings the Court to the question of whether evidence which is proffered by Defendant ONG of the increase in the cost to ONG of performing the take-or-pay contract in issue shows an increase sufficiently extreme and unreasonable so as to permit reasonable jurors to find that the contract has become commercially impracticable to perform. *See Golsen,* 756 P.2d at 1222.

The only evidence submitted by ONG of the amount of increase in cost to ONG of performing the contract in question is the following statement contained in the Affidavit of C.F. Hughes, Jr.:

The initial price under the Sabine contract was $1.72 per MMBtu, with a 3¢ per year fixed price escalation, immediately before the enactment of the NGPA in 1978. In comparison, Plaintiff, Sabine, claims the present price under the contract is now $3.812 per MMBtu. The current spot market price of gas is approximately $1.40 per MMBtu. Thus, Sabine seeks to impose a "contract" price that is close to three times the current spot market price of gas, and more than twice the current market value of gas. Affidavit of C.F. Hughes, Jr. (Exhibit "H", Appendix to Defendant's Brief) at ¶ 19.

While ONG states in its brief that the spot market price for gas may or may not affect the actual market value for gas, *see* Defendant's Brief at pp. 11–12 n. 7, ONG argues

---

**3.** Mr. Metcalf refers in his affidavit to the financial consequences *to ONG* (Oklahoma Natural Gas Company) if it were "required to pay its total estimated potential take-or-pay liability," *see* Affidavit of James A. Metcalf, Jr. (Exhibit "F", Appendix to Defendant's Brief) at ¶ 7, but because Oklahoma Natural Gas Company is a division of ONEOK Inc. and is not alleged to be independently incorporated, the liabilities of Oklahoma Natural Gas Company must be assumed to be those of ONEOK Inc. Mr. Metcalf does not address the financial consequences *to ONG Western, Inc.,* independently, of fulfilling its payment obligations under its take-or-pay contracts or under the particular contract in question.

that it is the disparity between its contract price and the *market value* of gas which makes the contract impracticable to perform, rendering it unreasonably and excessively expensive. Thus, evidence concerning the spot market price of gas is not directly relevant. The affiant does not state what the current market value of gas is, but the Court will accept as true the affiant's statement that the price under the contract for the year 1989 as Defendant asserts is claimed by Plaintiff, $3.812, is more than twice the current market value of gas. However, this evidence is not competent to establish the amount of disparity between the contract price for the years for which Plaintiff claims damages. *See* Brief in Support of Plaintiff's Motion for Partial Summary Judgment, Undisputed Facts at ¶ h; Affidavit of Paul E. Fulbright (Exhibit to Plaintiff's Motion) at ¶ 13. Indeed, ONG acknowledges in its brief that the market value of gas has not remained constant during the years in which the contract has been in effect, noting that the market value may have been as high as $3.00 per MMBtu at some time or times during the life of the take-or-pay contract. Defendant's Brief at pp. 11–12 n. 7. Because ONG has presented no competent evidence of an unreasonable and excessive increase in expense to it for the pertinent contract years in question as would render performance by payment during those years impracticable to perform or would show that the failure to excuse performance by payment during such years would result in "grave injustice," Plaintiff is entitled to summary judgment on Defendant's

affirmative defense of commercial impracticability.

Even if Defendant had submitted competent evidence that during the contract years in question, Defendant's cost of performance had increased by more than 170% over what it had been at the time of contracting,[4] over and above the automatic 3¢ per year fixed escalation in contract price,[5] or competent evidence that during each of the contract years in question the contract prices were more than twice the market values of gas for those years, or if the Court were to infer or *assume* from the evidence submitted that during all of the contract years in question the contract price was more than twice the market value of gas, the Court would be compelled to reject the defense of commercial impracticability as a matter of law. Defendant ONG assumed the very type of risk which it now claims, by virtue of the *degree* of risk, renders the contract impracticable. Moreover, a more than twofold increase in the cost of performing does not alter the essential nature of performance. *See* Uniform Commercial Code Comment 4 to Okla. Stat. title 12A, § 2–615.[6] To the extent the increase in the cost of performing was due to governmental regulation, governmental regulation is foreseeable as a matter of law and indeed was *foreseen* by these parties, as evidenced by the very contract into which ONG entered. *See* Gas Purchase Contract (Exhibit "A" to Plaintiff's Motion) at Article XVII ("Regulatory Bodies"). Thus Defendant cannot and really does not claim that the increase in cost was due to the "unforeseen contingency" of regulation. Instead it argues that the unforeseen

---

**4.** ONG asserts in its brief, unsupported by any evidence, that ONG's cost of performance has increased by more than 170%, which increase in costs results from the divergence between the contract price and market value of gas over the life of the take-or-pay contract. *See* Defendant's Brief at p. 12.

**5.** Even in the absence of the favored nations clause, the contract price would have increased by 30 cents per thousand cubic feet of gas from the time the parties entered into the contract until 1989. *See* Gas Purchase Contract (Exhibit "A" to Plaintiff's Brief) at Art. XIV, ¶ 14.1A. This represents a 21 percent increase in the cost of gas over the contract life. *See id.*

**6.** Defendant takes the position that cost increases of less than 100% are not extreme and unreasonable and thus will not support a commercial impracticability defense whereas cost increases in excess of 100% are extreme and sufficient to raise a fact issue as to whether the contract has been rendered impracticable to perform. *See* Defendant's Brief at pp. 15–17, citing at p. 16 nn. 9 & 10 a host of cases to support its position. An anomaly of this position is that a 1 percent increase in costs is determinative of whether a contract may have been rendered impracticable to perform.

contingency which caused increased costs was the *effect* of the regulation—which in turn *is* merely increased costs, a risk it assumed along with obligations which were greater than ordinary.[7]

### III. *Frustration of Purpose*

Plaintiff urges that the defense of frustration of purpose necessarily fails as a matter of law because 1) The principal purpose of the contract, which is unambiguous and has been admitted by Defendant, is not frustrated by the events alleged by Defendant; 2) A mere increase in cost cannot, as a matter of law, constitute frustration of purpose; and 3) Defendant assumed the risk that prices would escalate, which negates an element necessary to a frustration of purpose defense.

In its brief in response to Plaintiff's motion for partial summary judgment, Defendant does not separately address this defense or Plaintiff's arguments in relation thereto; rather, Defendant seemingly incorporates its arguments concerning the defense of commercial impracticability as a response to Plaintiff's arguments concerning the frustration defense. *See* Defendant's Brief at p. 6. Those arguments are summarized above.

 The defense of frustration of purpose is termed "Discharge by Supervening Frustration" in the *Restatement (Second) of Contracts* § 265 (1981) and is defined as follows:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Thus, the essential elements of the defense are 1) frustration of the principal purpose of the contract; 2) that the frustration is substantial; and 3) that the non-occurrence of the frustrating event or occurrence was a basic assumption on which the contract

was made. See Comment a, *Restatement (Second) of Contracts* § 265.

 As the basis for this defense, as for the defense of commercial impracticability, ONG relies on the disparity between the contract price and the market value of gas as the event or occurrence which frustrated the purpose of the contract, the non-occurrence of which it claims was a basic assumption of the contract. For essentially the same reasons that its defense of commercial impracticability fails and Plaintiff is entitled to summary judgment on that defense, Defendant's frustration of purpose defense fails and Plaintiff is entitled to summary judgment thereon.

It is clear from the precatory language and from a review of the entire agreement that the purpose of the gas purchase agreement was to insure Sabine, the seller, of a market for gas produced from the Sarkeys well and to insure ONG, the buyer, of a supply of gas for a twenty-year period. The Oklahoma Supreme Court, interpreting a very similar agreement which this Defendant entered into, described the purpose or intent of the agreement in this manner:

> Throughout the document the general purpose or intent is to arrange the purchase and sale of gas. These provisions give the defendant an exclusive right to take plaintiffs' gas for a term of years at a set price. The defendant acquires a contractually assured supply while the plaintiffs are assured a market; both parties doing so at a price which is an agreed part of the bargain. Secondly, the plaintiffs relinquish their right to sell gas to third parties and the plaintiffs in return are paid for a minimum annual quantity of gas whether or not taken in that year. *Golsen v. ONG Western, Inc.,* 756 P.2d at 1213.

Even if the Court were to consider the circumstances in which the contract was made, *see* Affidavit of C.F. Hughes, Jr. at ¶¶ 7 & 17, or extrinsic and parol evidence of the purpose for the price escalation provi-

---

**7.** The obligation to take-or-pay for a minimum quantity of gas over a twenty-year period at a fixed price, subject to price escalation, is a greater than ordinarily-assumed contractual obligation.

sion, *see id.* and Exhibit "B" to Motion for Partial Summary Judgment, the conclusion that the principal purpose for the contract was to assure Plaintiff, the seller, of a market for its gas for a term of twenty years and to assure Defendant of a supply of gas for that period would not be altered. A purpose or intent that the price escalation clause assure Plaintiff of a competitive price for its gas during the life of the contract and that ONG be assured that the clause would keep the contract price at the market price, to the extent such purpose and intent existed, may have been the principal purpose of the price escalation clause but it cannot be said to be the principal purpose of the entire contract. It is not enough that a party had in mind some specific object without which he would not have made the contract. Comment a, *Restatement (Second) of Contracts* § 265. "The object must be so completely the basis of the contract that, as both parties understand, without it the transaction makes little sense." *Id.*

ONG has submitted no evidence that the principal purpose of the contract has been frustrated. While Defendant has submitted evidence that it has lost some of its customers and that its customer base is smaller, it is implicit in affidavits submitted by Defendant and in Defendant's arguments that Defendant has customers who still need a supply of gas and that its parent's division, as a public utility, is still obligated to supply customers with gas. *Accord, Coquina Oil Corp. v. Transwestern Pipeline Co.,* —— F.Supp. ——, No. 86–562–M, slip op. (D.N.M. Sept. 19, 1986), *appeal dism'd for want of jurisdiction,* 825 F.2d 1461 (10th Cir.1987) ("Since defendant is still obliged to supply gas to California customers upon demand and since defendant still needs gas to operate its system, the purpose of the contracts continues.").

Nor has ONG submitted any evidence showing that frustration of the principal purpose of the contract is substantial. Even if the Court were to assume that a decrease in customers experienced by Defendant has frustrated to some degree ONG's purpose of assuring itself of a supply of gas to serve its customers, ONG has not submitted any competent evidence from which it could be inferred that the frustration has been substantial. ONG has submitted no evidence which quantifies the reduction in gas volumes needed to serve its current demand for gas. Moreover, in order for frustration of the principal purpose of a contract to be substantial, it "must be so severe that it is not fairly to be regarded as within the risks ... assumed under the contract." Comment a, *Restatement (Second) of Contracts* § 265. By obligating itself to pay for a minimum quantity of gas, if not taken, Defendant obviously assumed the risk of a decline in market demand under the contract. *Accord, Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.,* 813 F.2d 77, 80 (5th Cir.1987). More importantly, by obligating itself to pay the highest price being paid for gas in a four-county area, ONG assumed the risk of a disparity in the contract price and market price and a lack of demand or loss of customers, *see Golsen v. ONG Western, Inc.,* 756 P.2d at 1213 n. 2 (market demand is a function of price), for gas at or above the contract price and, in any event "[i]t is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss." Comment a, *Restatement (Second) of Contracts* § 265.

The third element necessary to the defense of frustration of purpose—that the non-occurrence of the frustrating event or occurrence must have been a basic assumption on which the contract is made—is identical to an essential element of the defense of commercial impracticability. ONG asserts that the occurrence which frustrated the purpose of the contract is the same occurrence which rendered the contract commercially impracticable to perform. For the reasons explained above, the non-occurrence of a disparity in contract price and the market price of gas was not a basic assumption on which the contract was formed.

## IV. *Contravention of Public Policy*

As its second affirmative defense to Plaintiff's Amended Complaint, Defendant ONG alleges that enforcement of the take-

or-pay provisions of the contract against it would constitute an unreasonable windfall to Plaintiff, and would either impose a severe economic burden on utility customers or impair or destroy ONG's ability to serve its residential, commercial and industrial customers in contravention of the public policy of Oklahoma. *See* Answer of Defendant ONG Western, Inc. to First Amended Complaint at ¶¶ 22–25. ONG alleges that because such enforcement would contravene Oklahoma public policy, the take-or-pay provisions of the contract are therefore void and unenforceable.

In support of its motion for partial summary judgment as directed to this defense, Plaintiff initially argues that this defense is legally untenable as evidenced by courts' unanimous rejection of public policy-based defenses, *citing Resources Investment Corp. v. Enron Corp.*, 669 F.Supp. 1038, 1040 (D.Colo.1987); *Arkansas Natural Gas Co. v. Arkansas Railroad Commission*, 261 U.S. 379, 382–83, 43 S.Ct. 387, 388, 67 L.Ed. 705, 710 (1923); *Sid Richardson Carbon & Gasoline Co. v. InterNorth, Inc.*, 595 F.Supp. 497, 500 (N.D.Tex.1984); and *Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.*, CA3–85–0723–R, slip op. (N.D.Tex. April 1, 1986); *aff'd* 813 F.2d 77 (5th Cir.1987). Secondly, Plaintiff asserts that the admission in Defendant's Answer "that any payments ONG would make for take-or-pay deficiencies would be included in its utility rate base on which ONG *must earn a reasonable rate of return*," Plaintiff's Brief at p. 36, *quoting* Answer at ¶ 23 (emphasis added), demonstrates that ONG will not suffer a financial loss from payment of take-or-pay deficiencies. Moreover, Plaintiff in effect asserts that ONG is judicially estopped to assert that it will lose customers due to higher gas prices if it passes the deficiencies on to customers because Defendant has asserted in a pleading filed in another case that it has captive customers who have no choice but to remain its customers and that therefore ONG can never experience a total collapse in demand. Thus, Plaintiff claims ONG's "death spiral" allegations "suffer from a fatal circuity." Plaintiff's Brief at p. 37. Finally, Plaintiff

asserts that declaration of the public policy of the state of Oklahoma unexpressed in the Oklahoma Constitution or statutes and unaddressed by the Oklahoma Corporation Commission and Oklahoma courts is on the fringe of or beyond the power of this Court, by reason of which the Court should exercise judicial restraint and reject the public policy defense.

Defendant asserts that pursuant to Okla. Stat. title 15, § 211, contracts contrary to public policy are unlawful even though the policy is not specifically expressed in a statute. Citing the concurring opinion in *Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1296 (10th Cir.1979) and the dissenting opinion in *Superior Oil Co. v. Western Slope Gas Co.*, 758 F.2d 500, 502 (10th Cir.1985), Defendant suggests that "courts have an important role in determining whether certain provisions in natural gas contracts should be struck down as against public policy." Defendant's Brief at p. 39. Defendant then leaps to the conclusion that Oklahoma's public policy regarding enforcement of favored nations or price escalation clauses "should not be determined on a motion for summary judgment where no facts have been presented by Sabine and without full consideration of the relevant issues." *Id.* at p. 41. Next, Defendant distinguishes the cases cited by Plaintiff because they deal with interstate pipelines "that have no ... regulatory imperative," *id.* at p. 41. Defendant describes the public policy applicable to a regulated utility in this manner:

A regulated utility such as ONG is required to render its service to the public at the lowest reasonable cost and its rate of return is strictly controlled; all costs incurred by it must ultimately be borne by the consuming public.

The purpose of public utility regulation is not only to secure a service for the community while seeking to obtain that service at a just and reasonable price, *see Federal Power Commission v. Sunray DX Oil Co.*, 391 U.S. 9, 16, [88 S.Ct. 1526, 1530,] 20 L.Ed.2d 388, 394 (1968), but also to insure the "financial integrity" of the public utility. *In re Permian*

*Basin Area Rate Cases,* 390 U.S. 747, 791–93 [88 S.Ct. 1344, 1372–73,], 20 L.Ed.2d 312, 349–51 (1968); *Data Transmission Co. v. Corporation Commission,* 561 P.2d 50, 54–55 (Okl.1976). The Corporation Commission has a basic mandate under the Oklahoma Constitution to protect consumers from excessive rates and charges, and its objective is to achieve the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest. *See Application of Valliant Tel. Co.,* 656 P.2d 273, 275 (Okl.1982); Oklahoma Constitution, Article IX, Section 18. Defendant's Brief at pp. 41–2.

Defendant in effect argues that the public policies of protecting consumers from excessive rates and of insuring the financial integrity of a public utility will be contravened by enforcement of the take-or-pay provisions of the contract because the deficiency payments would either have to be passed directly on to consumers as the cost of gas, *see Application of Oklahoma Natural Gas Co.,* 406 P.2d 273, 277 (Okla. 1965), through increased rates, or they would have to be included in ONG's rate base which would in turn increase ONG's rates to consumers. Defendant submits the Affidavit of James A. Metcalf, Jr., Vice President–Controller and Chief Accounting Officer of Oklahoma Natural Gas Company, a division of ONEOK Inc., as evidence of these two modes of recouping deficiencies. Under the latter scenario, according to the affiant, ONG would be required to borrow money to pay deficiencies pending recoupment by inclusion of the take-or-pay liability in the base rate and, assuming that it could borrow such funds, ONG would be at risk of defaulting on its long-term debt agreements, *see* Metcalf Affidavit at ¶ 9, requiring a still greater rate increase, *id.,* and in any event its resources would be depleted to such an extent that it would be unable to borrow funds for working capital. *Id.* at ¶ 11. Moreover, the affiant expresses the opinion that he does "not believe that ONG would be able to borrow sufficient money to pay the estimated potential take-or-pay liability." *Id.* However, it should be noted that ONG in its

arguments and Mr. Metcalf in his affidavit in referring to take-or-pay liability or deficiencies are referring at all times to an estimated potential take-or-pay liability through August of 1988 for ONEOK Inc., Oklahoma Natural Gas Company, a division of ONEOK, and ONG Western, Inc.

The arguments and authorities of the parties addressed to this affirmative defense are not particularly helpful or persuasive. Oklahoma statutory law does provide that contracts which are "[c]ontrary to the policy of express law, though not expressly prohibited" are unlawful. Okla. Stat. title 15, § 211. "Unlawful" as used in this statute means ineffectual in law, *see Conine v. Leikam,* 570 P.2d 1156, 1159 (Okla.1977), or void and unenforceable.

The Court will accept that the State of Oklahoma has a public policy in favor of insuring "the public adequate public utility service at reasonable rates without discrimination," *Application of Valliant Telephone Co.,* 656 P.2d 273, 275 (Okla.1982), and in insuring investor's confidence in the financial soundness of a utility, including its ability to maintain and support its credit, so that it will be able to raise money necessary to improve and expand its service and to discharge its public duties. *See Southwestern Public Service Co. v. State,* 637 P.2d 92, 96 (Okla.1981), *quoting Public Service Commission v. South Central Bell Telephone Co.,* 348 So.2d 443 (Ala. 1977). *See also Lone Star Gas Co. v. Corporation Commission,* 648 P.2d 36, 39–40 (Okla.1982) (public utility is entitled to a return to the equity owner "sufficient to enable the public utility to operate successfully, maintain its financial integrity, attract capital, and compensate its investors for the risk assumed"; utility's operating expenses properly considered in determining rate base and rate of return for utility); *State ex rel. Cartwright v. Oklahoma Natural Gas Co.,* 640 P.2d 1341, 1349 (Okla.1982) (rate base method of setting rates takes into account utility's expected expenses plus an amount of net profit to be allowed utility). This policy derives from the Corporation Commission's duties to supervise, regulate and control

public utilities in matters relating to performance of the public duties, to prescribe and enforce rates for such companies and to "require them to establish and maintain all such public service, facilities and conveniences as may be reasonable and just," Okla. Const. Art. 9, § 18. *See also* Okla. Stat. title 17, §§ 152; 153; and from duties of public utilities implied in the common law, *see* 64 Am.Jur.2d *Public Utilities* § 16 (1972). The policy of preservation of the financial integrity of public utilities also derives in part from constitutional prohibitions against taking of private property without just compensation. *See, e.g., Wiley v. Oklahoma Natural Gas Co.,* 429 P.2d 957, 958 (Okla.1967). Thus, rates which would not permit a utility to earn a reasonable return on its investment or which would impair its financial integrity would be "confiscatory," *see Application of Valliant Telephone Co.* 656 P.2d at 275, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and of Sections 7, 23 and 24 of Article 2 of the Oklahoma Constitution. *See Southwestern Public Service Co. v. State,* 637 P.2d at 96; *Southwestern Bell Telephone Co. v. State,* 204 Okla. 225, 230 P.2d 260 (1951).

■■■■■ By seeking a declaration by this Court that the contract of ONG Western, Inc. with Plaintiff contravenes these public policies, Defendant is in effect asking this Court to intrude upon the exclusive jurisdiction of the Oklahoma Corporation Commission. Defendant in effect asks this Court to either predict that the Corporation Commission would not permit the cost of gas or the payment obligation under this contract to be passed on to utility customers through increased rates or an increase in rate base, or to make a predictive judgment that if the Corporation Commission

permits Defendant's take-or-pay liability under this contract and the estimated take-or-pay liabilities of ONEOK Inc. and Oklahoma Natural Gas Company to be passed on to utility customers in the form of increased rates or by increasing the utility's rate base, the rates to customers will be excessive and unreasonable. This it will not do. Nor will the Court nullify Defendant's contract to insure the financial integrity of a public utility which is not even a party to the contract.[8] Protection of a public utility's financial integrity is initially within the authority and duties of the Corporation Commission through its rate-making function.

Moreover, the Oklahoma Supreme Court's recognition of both a strong public policy of freedom of contract and the carefully circumscribed circumstances in which a contract may be judicially voided for public policy reasons convince the Court that Defendant's public policy defense is insufficient as a matter of law. *See R. W. Hart & Co. v. Harris,* 183 Okl. 588, 83 P.2d 565, 568 (1938) (whether a contract is against public policy is a question of law for the Court to determine from all of the circumstances of the case). "Public policy requires that competent persons 'shall have the utmost liberty of contracting, and their contracts, when entered into fairly and voluntarily, shall be held sacred, and shall be enforced by courts of justice.'" *Id., quoting Printing and Numerical Registering Co. v. Sampson,* L.R. 19 Eg. 462, 465 [21 Eng.Rul.Cas. 696].

[T]he right of private contract is no small part of the liberty of the citizen, and ... the usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public

---

**8.** Although Mr. Metcalf and Mr. Hughes attest that the operations of ONG Western, Inc. and Oklahoma Natural Gas Company (the natural gas utility division of ONEOK Inc.) are integrally related and that their operations are considered a single unit for purposes of regulation by the Oklahoma Corporation Commission, *see* Affidavit of James A. Metcalf, Jr. at ¶ 1 and Affidavit of C.F. Hughes, Jr. at ¶ 3 (Exhibits "F" and "H" respectively, Appendix to Defendant's

Brief), they are not competent to testify concerning how the Oklahoma Corporation Commission considers them for regulatory purposes, and absent evidence that Oklahoma Natural Gas Company is contractually obligated to ONG Western, Inc. to purchase the gas which the latter purchases from Sabine, the Court has serious doubt that Defendant ONG Western, Inc. may properly invoke public policies concerning a public utility or a public utility's customers.

policy, unless it clearly appear that they contravene public right or the public welfare. *Baltimore & Ohio Southwestern Railway Co. v. Boight* [*Voight*], 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560, 565 (1900), *quoted in Telex Corp. v. Hamilton*, 576 P.2d 767, 769 (Okla.1978). The power of courts to nullify contracts as in contravention of public policy is a very delicate power, to be exercised only rarely, with caution and restraint, and only in cases that are free from doubt. *Shepard v. Farmers Insurance Co.*, 678 P.2d 250, 251 (Okla.1983); *Johnston v. J.R. Watkins Co.*, 195 Okla. 341, 157 P.2d 755, 757 (1945); *Camp v. Black Gold Petroleum Co.*, 189 Okla. 692, 119 P.2d 815, 817–18 (1941); *R.W. Hart & Co. v. Harris*, 83 P.2d at 568. Detriment to the public interest is not to be presumed, but must be clearly apparent before a court is justified in declaring a contract unenforceable on public policy grounds. *See Johnston v. J.R. Watkins Co.*, 157 P.2d at 757; *R.W. Hart & Co. v. Harris*, 83 P.2d at 568. And in Oklahoma, "a contract violates public policy only it if clearly tends to injure public health, morals or confidence in administration of law or it undermines the security of individual rights with respect to either personal liabilities or private property." *Shepard v. Farmers Insurance Co.*, 678 P.2d at 251, *citing Anderson v. Reed*, 133 Okla. 23, 270 P. 854 (1928).

Finally, whether a contract or term therein is unenforceable on public policy grounds is determined as of the time that the contract was made and "is not ordinarily affected by a subsequent change of circumstances, whether of fact or law." Comment d, *Restatement (Second) of Contracts* § 179 (1981). Defendant does not assert and submits no evidence that the contract was in contravention of public policy at the time it was made.

## V. *Conservation Defenses*

In its eighth affirmative defense to Plaintiff's Amended Complaint, ONG asserts upon information and belief that production by Plaintiff and delivery to ONG of volumes of gas in excess of those volumes of gas actually taken during the 1982 through 1987 contract years "would have resulted in the production of natural gas in excess of the reasonable market demand therefor, which would, in turn, have constituted waste in violation of 52 O.S.1981, § 86.3 and § 239, and Rules 1–101 and 1–202(b) of the Oklahoma Corporation Commission Oil and Gas Rules." Answer To First Amended Complaint at ¶ 32. Additionally, as part of this defense, ONG asserts that production and delivery to ONG of volumes of gas in excess of what was actually taken by ONG after January 1, 1984 and through the 1987 contract year would have resulted in a violation of Rule 1–305 (the "priority rule") of the Oklahoma Corporation Commission, requiring that all gas purchases or takes from wells within each designated priority be ratable whenever permitted production of gas from wells from which a purchaser or taker is required to take exceeds the market demand for such purchaser or taker. *See id.* at ¶ 33. ONG then alleges that since no volumes in excess of what was actually taken during the relevant periods were "legally deliverable", there "was no valid contractual obligation on the part of ONG to take or pay for any volumes of natural gas from the wells in excess of those volumes in fact taken...." *Id.* at ¶¶ 32 & 33.

As alternative grounds for its motion for partial summary judgment directed to this defense, Plaintiff asserts that Defendant is collaterally estopped from asserting the conservation defenses by virtue of the judgment adverse to Defendant in *Golsen v. ONG Western, Inc.*, 756 P.2d 1209, 1220, and that the defenses are insufficient as a matter of law by virtue of that decision. In its response brief, Defendant asserts that arguments responsive to other arguments made by Sabine and Defendant's "Statement of Material Facts in Controversy" show that fact questions exist and that summary judgment is not appropriate as to these and other defenses and its counterclaims. Defendant's Brief at pp. 50–51. In its "Statement of Material Facts in Dispute," Exhibit "B", Appendix to Defendant's Brief, Defendant cites to the Affidavit of C.F. Hughes, Jr., ¶¶ 7–27 to support its assertion that whether a market existed

for Sabine's natural gas during and after 1982 is a material issue of fact.

First, the Court finds that there is no material issue of fact concerning whether a market existed for Sabine's natural gas during and after 1982. As the Oklahoma Supreme Court observed in *Golsen v. ONG Western, Inc.*, "[t]he producer's contract is proof that ... [it] has a market and it is that market ... [it] is trying to enforce here." 756 P.2d at 1216. Secondly, for the reasons stated in *Golsen v. ONG Western, Inc.*, 756 P.2d at 1214–1220, ONG's affirmative defense based upon Okla.Stat. title 52, § 86.3 and § 239 and Rules 1–101, 1–202(b) and 1–305 of the Oklahoma Corporation Commission fails as a matter of law.

## VI. *Penalty or Liquidated Damages*

■ The essence of Defendant ONG's fourth affirmative defense, on which Plaintiff seeks summary judgment, is that because ONG will not, due to market conditions, be able by later takes to make up payment for gas previously not taken, Sabine will remain free to resell such gas paid for but not taken by ONG, resulting in a windfall to Sabine and demonstrating that Sabine "has not suffered damage to the full extent of the contract price for the gas not taken by the buyer." Answer to First Amended Complaint at ¶ 27. Therefore, ONG alleges, the take-or-pay provisions operate as a penalty or liquidated damages provision and are unenforceable pursuant to Okla.Stat. title 12A, § 2–718(1) and Okla. Stat. title 15, § 214 because the amount of the deficiency sought by Plaintiff bears no reasonable relationship to Plaintiff's actual damages and the amount of actual damages is not impracticable or extremely difficult to determine. *Id.* at ¶ 28.

Sabine asserts that the payment obligation under a take-or-pay contract is a promise or obligation, not a punishment for breach, and that payment pursuant to such contract provision constitutes performance thereof, not payment for breach of the contract of an amount stipulated as damages. Thus, Plaintiff asserts that the payment obligation is neither a penalty or a liquidated damages provision, *citing Resources Investment Corp. v. Enron Corp.*,

669 F.Supp. 1038 (D.Colo.1987) and *Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.*, No. CA3–85–0723–R, slip op. (N.D.Tex. April 1, 1986), *aff'd* 813 F.2d 77 (5th Cir.1987).

ONG again makes a minimal response, asserting on the basis of the Hughes Affidavit, ¶¶ 4 & 5, that material issues of fact exist as to whether ONG will be able to recoup take-or-pay payments made to Sabine and as to whether the amount of take-or-pay payments demanded by Sabine bears any reasonable relationship to any actual and potential damages of Sabine due to ONG's alleged breach. *See* "ONG's Statement of Material Facts in Dispute," Exhibit "B," Appendix to Defendant's Brief at ¶ 4.

Whether or not ONG will be able to recoup take-or-pay payments is not material. An assumption that ONG cannot recoup such payments does not render the take-or-pay provisions or the payment obligation under the contract a penalty or a liquidated damages provision. The Court agrees with Plaintiff and with the United States District Court for the Northern District of Texas that "[t]he take-or-pay provision ... specifies a contractual obligation rather than dictates damages upon breach." *Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.*, No. CA3–85–0723–R, slip op. (N.D.Tex. April 1, 1986) at p. 5 n. 5 (*citing Sisk v. Parker*, 469 S.W.2d 727 (Tex.Civ.App.—Amarillo 1971, writ ref'd n.r.e.), *aff'd*, 813 F.2d 77 (5th Cir.1977). Accordingly, the take-or-pay provision, or more particularly the payment provision, cannot constitute a penalty for failure to perform or a liquidated damages provision specifying damages for breach of the "take" obligation. *Id.* *Accord, Resources Investment Corp. v. Enron Corp.*, 669 F.Supp. at 1041; *Superior Oil Co. v. Transco Energy Co.*, 616 F.Supp. 98, 108 (W.D.La.1985); *Koch Industries, Inc. v. Columbia Gas Transmission Corp.*, No. 83–990–A, slip op. (M.D.La. March 14, 1985). *See also International Minerals & Chemical Corp. v. Llano, Inc.*, 770 F.2d 879, 885 (10th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 310

(1986) (take-or-pay contracts impose *alternative* obligations); Comment b, *Restatement (Second) of Contracts* § 361(1981) (distinguishing provision for alternative performance from liquidated damages provision).

## VII. *Release*

 Plaintiff asserts in support of its motion for partial summary judgment that Defendant has adduced no specific factual evidence to support its defense of a release of its contractual obligations. The Court agrees. "ONG's Statement of Material Facts in Dispute" cites no facts relevant to this defense nor are any found in the affidavits submitted by ONG. ONG's complete failure to submit any evidence in support of this, its sixth affirmative defense, on which it will have the burden of proof at trial, entitles Plaintiff to summary judgment on this defense. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 273 (1986).

## VIII. *Statute of Limitations*

 Partial summary judgment in favor of Defendant ONG on Plaintiff's claim for damages accruing in 1981 for alleged breach of the take-or-pay contract was entered on February 16, 1989. By this motion, Plaintiff seeks summary judgment on its claim for damages for breach of contract during the years 1982, 1983, 1985, 1986 and 1987. Pointing out that suit was filed on January 22, 1988, Plaintiff seeks summary judgment on Defendant's statute of limitations defense with respect to the contract years yet in question. Apparently Defendant contends that Plaintiff's claim for damages for breach of contract for the years in question is barred by the five-year statute of limitations applicable to Plaintiff's claim, Okla.Stat. title 12, § 95 (First).

Since by the terms of the contract, deficiency payments for 1982 were not due until payment for gas purchased during the accounting month following the accounting year of 1982 was due to be made, *see* Gas Purchase Contract (Exhibit "A" to Plaintiff's Motion) at ¶ 5.1, which, under the contract, was on or before the twenty-fifth day of the calendar month following Buyer's accounting month in which the gas was delivered, *see* Gas Purchase Contract (Exhibit "A" to Plaintiff's Motion) at ¶ 14.1, i.e., on February 25, 1983, *see id.* at ¶ 1.1 (definition of accounting year which begins between December 19 and December 25 of one calendar year);[9] ¶ 1.2 (definition of accounting month); ¶ 5.1 (when payment for deficiencies is due), Plaintiff's claim for breach of the take-or-pay contract for the years in question is not barred by the statute of limitations as a matter of law. Plaintiff is entitled to summary judgment on Defendant's statute of limitations defense.

## IX. *Limitation of Remedies*

As its fifth affirmative defense, Defendant alleges that by seeking to enforce the take-or-pay provisions of the contract for recovery of the full contract price of gas not taken during the contract years in question, Plaintiff is in effect seeking specific performance of the take-or-pay provisions, which ONG alleges is "not an available or appropriate remedy under the circumstances of this case." Answer to Amended Complaint at ¶ 29.

Plaintiff seeks summary judgment on this defense, arguing alternatively that it is not seeking specific performance of the "pay" provision of the contract but rather damages, the best measure of which is the amount Sabine would have received if ONG had performed by payment and, in any event, specific performance of the "payment" obligation is appropriate, citing Article XX of the Gas Purchase Agreement. Defendant makes no responsive arguments.

---

**9.** Paul E. Fulbright, the Director of Regulations and Contract Administration for Sabine, *see* Affidavit of Paul E. Fulbright, Exhibit to Plaintiff's Motion at ¶ 2, who is responsible for administering the Gas Purchase Contract, *id.* at ¶ 3, states in his affidavit, contrary to the terms of the Gas Purchase Contract, Art. I, ¶ 1.1, that the annual accounting period under the contract begins on January 1 and ends on December 31 of each year. *Id.* at ¶ 4. This parol evidence cannot vary the terms of the contract, but the result—that Plaintiff's claims are not time-barred—would be the same utilizing Mr. Fulbright's definition of an "accounting year."

The Court agrees with Plaintiff that by its Amended Complaint it is seeking damages for breach of the contract. *See* First Amended Complaint at ¶ 11 & Prayer. The Court concludes that it is unnecessary to reach the question of whether the relief of specific performance of the "pay" obligation would be available or appropriate. Plaintiff's motion is granted with respect to this defense.

### X. *Mitigation of Damages*

Plaintiff seeks summary judgment on Defendant's ninth affirmative defense which alleges on information and belief that part or all of Plaintiff's claim for relief is barred because Plaintiff failed to mitigate its damages. Answer to First Amended Complaint at ¶ 34. Plaintiff asserts that because it is obligated under the contract to sell all of its gas from the Sarkeys well, and from any other well on the land in question, to ONG during the contract term, ONG is the sole market for Sabine's gas and Sabine's mitigation of its damages by selling gas to third parties is expressly forbidden by the contract. Such mitigation, Sabine asserts, would require it to breach its agreement to sell exclusively to ONG and to abandon its rights under the contract. Citing *United States v. Sabin Metal Corp.*, 151 F.Supp. 683 (S.D.N.Y. 1957), *aff'd*, 253 F.2d 956 (2nd Cir.1958) and *Farmers Co-operative Association v. Shaw*, 171 Okla. 358 42 P.2d 887, 889 (1935), Plaintiff asserts that there is no duty to mitigate damages when to do so would include abandonment of any of the mitigating party's contractual rights. Finally, Plaintiff asserts that ONG has adduced no evidence to support its contention of Sabine's failure to mitigate, which entitles Plaintiff to summary judgment on this defense under *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Sabine's assertion that it couldn't mitigate its damages by reselling gas because the contract required it to hold the gas for ONG is, according to Defendant, "without legal basis." Brief of Defendant at pp. 53–54. Defendant submits that U.C.C. § 2–706, Okla.Stat. title 12A, § 2–706 gives the seller an unqualified legal right, upon breach by the buyer, to resell the goods. Defendant further asserts that Sabine had other markets available for its gas because the Sarkeys well is a "split stream" well with connections to more than one purchaser. Moreover Defendant asserts that Plaintiff may be required to sell gas to ONG at a reduced price or in reduced volumes to satisfy its mitigation obligation, *citing Key v. Kingwood Oil Co.*, 110 Okla. 178, 236 P. 598, 599 (1925). Without citing any evidence, Defendant asserts that Sabine had the means to mitigate its damages for any alleged breach by Defendant. Defendant contends that *whether* Sabine has mitigated its damages and the impact of any such efforts on Plaintiff's damage claim is a question of fact for the jury.

■ The party asserting a breach of contract has a duty, under Oklahoma law, to make all reasonable efforts to minimize his damages. *See Consolidated Cut Stone Co. v. Seidenbach*, 181 Okla. 578, 75 P.2d 442, 450–51 (1937); *Staner v. McGrath*, 174 Okla. 454, 51 P.2d 795, 798 (1935).

■ The failure to mitigate damages is an "incomplete" affirmative defense, that is, one which will not entirely defeat recovery but which goes only to the amount of damages the injured party may recover. *See Consolidated Cut Stone Co. v. Seidenbach*, 181 Okla. 578, 75 P.2d at 451. The party allegedly guilty of breaching a contract who asserts as a "defense" the other party's failure to mitigate damages has the burden of introducing evidence showing that the damages or some part of the damages claimed by the non-breaching party were avoidable by him. *See id.; Staner v. McGrath*, 174 Okla. 454, 51 P.2d at 798. *Accord, Hidalgo Properties, Inc. v. Wachovia Mortgage Co.*, 617 F.2d 196, 200 (10th Cir.1980) (applying Oklahoma law).

■ Defendant points to the Affidavit of Eddie J. Hudson (Exhibit "R" Appendix to Defendant's, Brief), ¶¶ 4 & 5, to support its assertion that material issues of fact exist concerning mitigation of damages. *See* "ONG's statement of Material Facts in Dispute" (Exhibit "B" Appendix to Defen-

dant's Brief) at ¶ 6. Accordingly, the Court examines this evidence to determine whether Defendant has submitted evidence creating factual issues relating to this defense. The cited paragraphs of the affidavit are devoted to explaining how and why, in the opinion of the affiant, Plaintiff's calculations of damages are incorrect. Neither this affidavit nor either of the other affidavits submitted by Defendant contain any evidence to the effect that Plaintiff could have sold its gas to a third party, that Sabine did not attempt to sell ONG reduced volumes or at reduced prices with a reservation of contract rights or that ONG offered to purchase the gas at a reduced price or reduced volumes, with a reservation to Plaintiff of its contractual rights, and that Plaintiff refused such offer. In short, Defendant has failed to submit one whit of evidence that Plaintiff could have avoided part of the damages alleged. Defendant's complete failure of proof on this issue on which it will have the burden of proof at trial entitles Plaintiff to summary judgment on this "defense." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 273 (1986). Accordingly, it is unnecessary to reach the purely legal issue raised by Plaintiff's motion.

## XI. *Mutual Mistake*

ONG has asserted three counterclaims against Sabine, all of which are predicated on a mutual mistake of the parties. The first counterclaim, for reformation of the take-or-pay contract, alleges that the contract does not in fact express the intention and meaning of the parties due to their mutual mistake in failing to expressly condition ONG's obligation on ONG's

being able to take the specified volume of gas insofar as the particular markets of ONG would permit such a purchase and without unlawfully discriminating against ONG's other suppliers of gas, and to provide for occasional minor fluctuations resulting from weather and other causes. Answer to First Amended Complaint at ¶ 36.

In its second counterclaim, also for reformation, ONG alleges that the contract fails to express the parties' intentions and meaning in the favored nations clause of the price redetermination provisions. *Id.* at ¶ 40. Defendant alleges that this is a result of a mutual mistake consisting of the use of language in the favored nations clause which prescribes the use of price redetermination criteria which do not reflect the actual current market value of natural gas. *Id.* By its third counterclaim ONG seeks rescission of the contract based on the mutual mistakes alleged in the first two counterclaims. *See id.* at ¶ 44.

Plaintiff has moved for summary judgment on ONG's counterclaims, asserting that the contract is unambiguous; that ONG has no evidence of a mutual mistake of the parties regarding the interpretation of the take-or-pay and favored nations clauses; that any mistake in interpretation is unilateral and does not excuse performance by ONG; that if the mutual intent of the favored nations clause had been to achieve a contract price equivalent to the current market value, the parties would not have included the complex price redetermination provisions in the contract; that parol and extrinsic evidence may not properly be considered; and that rescission may not be granted because restoration of the status quo is impossible. ONG directs no specific arguments to the viability of its counterclaims. Rather, it merely asserts in its "Statement of Material Facts in Dispute" that fact questions exist concerning the parties' intent and the accuracy of expression of their intent in the contract, evidenced by the affidavits submitted by ONG. See "ONG's Statement of Material Facts in Dispute" (Exhibit "B", Appendix to Defendant's Brief) at ¶ 7, citing Hughes Affidavit ¶¶ 7–27; Metcalf Affidavit, ¶¶ 6–12; and Hudson Affidavit, ¶¶ 4 & 5.

 Reformation on grounds of mutual mistake requires, under Oklahoma law, proof by clear and convincing evidence of the following: 1) An antecedent agreement to the terms of which a writing should be reformed; 2) A mutual mistake as a result of which the writing reflects something neither party intended; and 3) That the party seeking reformation was

free of neglect. *See Clearly Petroleum Corp. v. Harrison,* 621 P.2d 528, 533 (Okla. 1980); *Boettler v. Rothmire,* 442 P.2d 511, 514–15 (Okla.1968); *Dennis v. American–First Title & Trust Co.,* 405 P.2d 993, 997 (Okla.1965); *National Fire Insurance Co. of Hartford v. McCoy,* 205 Okla. 511, 239 P.2d 428, 430 (1951); *Webster v. Woods,* 586 P.2d 337 (Okla.App.1978); *Pasternak v. Lear Petroleum Exploration, Inc.,* 790 F.2d 828, 835 (10th Cir.1986). Proof of what the parties' actual intent and agreement was and that the writing does not reflect the actual agreement may be by parol evidence, the parol evidence rule being inapplicable since the evidence is offered not to vary or contradict a written contract but to show that the writing does not reflect the actual agreement of the parties. *Nelson v. Daugherty,* 357 P.2d 425, 432 (Okla.1960), *quoting Fabbro v. Reese,* 206 Okla. 655, 246 P.2d 324, 325, Syllabus by the Court at 1 (1952); *Webster v. Woods,* 586 P.2d at 338.

■ The Court examines the evidence proffered by Defendant to determine whether Defendant has submitted evidence of each of these essential elements and whether, upon viewing the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 215 (1986), a reasonable fact finder could find for Defendant on either of the reformation claims.

Paragraphs 6–12 of the Metcalf Affidavit address the purported hardship to Oklahoma Natural Gas Company and its customers of complying with all of the take-or-pay contracts to which it or related entities are parties. The cited paragraphs and the affidavit *in toto* are irrelevant to Defendant's claims for reformation.

Although the affidavit of C.F. Hughes, Jr., who was responsible for negotiations of the contract in question, *see* Hughes Affidavit (Exhibit "H," Appendix to Defendant's Brief), contains evidence of a mistake by ONG in basic assumptions about the future price for gas under the contract relative to the future market price for gas and about future markets for ONG's gas at

the contract price (which assumptions are related), *see id.* at ¶ 7, and evidence that ONG intended and understood that "the price to be paid under the contract would remain at or near the market price, *id.,* the affidavit contains no competent evidence that this mistake was mutual. The affiant is not competent to testify concerning what Sabine believed, intended or understood. Even if Mr. Hughes' testimony concerning Sabine's assumptions, intent and understanding could properly be considered by this Court, his conclusory statements concerning Sabine's intent and understanding certainly do not rise to the level of clear and convincing evidence of a mutual mistake. Moreover, the affidavit contains no evidence of an *agreement* that ONG's obligation *to take or pay* be conditioned on ONG's continued ability *to take* the minimum specified volumes without discriminating against other producers and conditioned on the continued existence of markets for ONG's gas at the contract price, *compare with* Answer to First Amended Complaint at ¶ 36, or of an *agreement* that the contract price upon any future redeterminations would equal or approximate the market price or fair market value of gas operative at the time, *compare with* Answer to First Amended Complaint at ¶ 40, much less clear and convincing evidence of any such agreement. The affidavit of Eddie J. Hudson contains no evidence of any of the essential elements of the reformation claims.

Even if the Court considers evidence submitted by Sabine in the form of a letter from S. Clay Cox of Sabine to a Mr. G.D. Brown of ONG requesting that an "area rate provision" be added in Article XIV of the contract "in order that ONG be price competitive with the interstate pipeline contemplating connection of this well," Exhibit "B" to Plaintiff's motion, there is a complete absence of proof by clear and convincing evidence of an agreement of the parties that ONG's obligation be conditioned on its ability to take (other than as may have actually been expressed in the force majeure clause) and/or the existence of markets for ONG's gas; of an agreement of the parties that price redetermination un-

der the contract effect a price for gas at or near the market price; and of a mutual mistake by the parties in reducing either such agreement to writing. Accordingly, Plaintiff is entitled to summary judgment on Defendant's first two counterclaims. *See Celotex Corp. v. Catrett,* 477 U.S. at 323–23, 106 S.Ct. at 2552–53, 91 L.Ed.2d at 273; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 254–55, 106 S.Ct. at 2513, 91 L.Ed.2d at 215–16 (on issue on which non-moving party bears the burden of proof at trial, lack of quantum and quality of proof from which fact finder could find in favor of non-moving party entitles movant to summary judgment.)

 Defendant cites the same evidence to support its claim for rescission based upon a mutual mistake. To obtain rescission of a contract due to a mutual mistake, it must be shown that the mutual mistake is of a "past or present fact, material to the agreement, and ... not ... a mistake in prophecy, opinion, or in belief, relative to an uncertain event," *Holmes v. Missouri–Kansas–Texas Railroad Co.,* 574 P.2d 297, 299 (Okla.1978), *quoting Davis v. Higgins,* 95 Okla. 32, 217 P. 193 (1923) and *Birch v. Keen,* 449 P.2d 700 (Okla.1969); *see also* Okla.Stat. title 15, § 63, or a "mistake as to a material part of the agreement so as to prevent a meeting of the minds upon that issue." *Madill Bank and Trust Co. v. Herrmann,* 738 P.2d 567, 572 (Okla. App.1987), *citing* Okla.Stat. title 15, §§ 62–64 and *Watkins v. Grady County Soil and Water Conservation District,* 438 P.2d 491 (Okla.1968). And as when reformation is sought to correct a mutual mistake, a party seeking rescission must show that he was free from negligence in making the agreement. *Ware v. City of Tulsa,* 312 P.2d 946, 950 (Okla.1957). Evidence of a mutual mistake and of lack of negligence by the party seeking rescission must be clear and convincing. *See id.* Furthermore, rescission requires the restoration of the status quo. *Holden v. DuBois,* 665 P.2d 1175, 1177 (Okla.1983); *Commercial Communications, Inc. v. State ex rel. Oklahoma Board of Public Affairs,* 613 P.2d 473, 476 (Okla.1980). *See also* Okla.Stat. title 15,

§ 233A; § 233B; § 235. *Cf. Federal Deposit Insurance Corp. v. Palermo,* 815 F.2d 1329, 1339 (10th Cir.1987), *citing* Okla.Stat. title 15, § 235 (failure to promptly, upon discovering facts entitling party to rescind offer to return everything of value received under contract precludes party from seeking remedy of rescission).

 Defendant has submitted no competent evidence showing that the purported mistake was mutual. And the Court agrees with Plaintiff that rescission may not be granted because Defendant has failed to offer to return gas taken under the contract and, in any event, restoration of the status quo is impossible. Plaintiff is entitled to summary judgment on Defendant's third counterclaim as well.

## XII. *Damages*

In response to Plaintiff's motion directed to the issue of damages for the years in question, Defendant asserts that Sabine's calculations of damages bear no relationship to the proper measure of damages, which ONG asserts is that provided at either U.C.C. § 2–708(1), Okla.Stat. title 12A, § 2–708(1) or U.C.C. § 2–723, Okla.Stat. title 12A, § 2–723. Even if the contract formula for determining the amounts of ONG's deficiency obligations, on which Sabine's calculations are based, provides the correct measure of damages, Defendant asserts on the basis of the affidavit of Eddie J. Hudson that Sabine's calculations are "fraught with error." Defendant's Brief at p. 52.

 Assuming without deciding that the measure of damages reflected by the calculations of Sabine's Director of Regulations and Contract Administration Paul E. Fulbright is correct, Plaintiff's motion for partial summary judgment directed to the issue of the amount of its damages for the years in question must nevertheless be denied. First, the Court is unable to ascertain from Mr. Fulbright's affidavit and the exhibits thereto that the calculations comport with Articles IV and V of the Gas Purchase Contract as a matter of law. Secondly, the Court finds that genuine issues of material fact concerning the

amount of ONG's payment obligation under the contract for the years 1982, 1983, 1985, 1986 and 1987 exist. Evidence offered by Sabine is itself conflicting on the amount of ONG's deficiency payment obligation for the years 1982 and 1983. *Compare* Affidavit of Paul E. Fulbright at ¶ 14 & Exhibit "C" thereto with *id.* at ¶ 16 and Exhibit "E" thereto. Furthermore, Defendant has submitted evidence in the form of the affidavit of Eddie J. Hudson, Exhibit "R", Appendix to Defendant's Brief, who personally reviewed and analyzed all production, purchase, testing, operating and engineering records of ONG on the Sarkeys well and all records produced by Plaintiff and the operator of the well, *see id.* at ¶ 2 and who reviewed Mr. Fulbright's calculations, attesting that Mr. Fulbright's and thus Sabine's calculations of deficiencies/damages do not take into account days when the well could not physically produce gas (for reasons other than were attributable to ONG when ONG was capable of receiving gas) or was shut in and specifying the number of days that this occurred during each contract year in question. *See id.* at ¶ 4(b). Whether this evidence creates a material issue of fact depends upon whether the contract provisions defining the "volumes of gas required to be taken or paid for if tendered," Gas Purchase Agreement (Exhibit "A" to Plaintiff's Motion) at Art. IV, require that in computing such volumes consideration must be given to the days when the well could not physically produce or are ambiguous in respect to whether same must be considered. The Court concludes that language in the provision in question relative to whether days when the well is physically incapable of producing must be considered in computing an annual take-or-pay obligation is facially ambiguous, susceptible to more than one interpretation, but that application of the rules of contract construction, Okla.Stat. title 15, § 154 *et seq.*, resolves such ambiguity to the effect that the contract requires that the annual take or pay obligation account for days when the well is not physically capable of producing.

The following language suggests that to determine a minimum annual payment obli-gation, one would simply multiply the number of days in a year that the buyer failed to take or pay times 75% of what the well is physically and legally capable of producing on its best day, or at least during its peak period, times the seller's percent of working interest in the well:

[T]he minimum yearly volume to be taken or paid for ... shall be the cumulative total for an accounting year of the daily volume of gas calculated as set forth below....

. . . .

(2) *Deliverability*—this daily volume of gas shall be seller's percent of working interest in each such gas or gas condensate well times seventy-five percent (75%) of the daily deliverability of such well. For the purposes of this contract, the "daily deliverability" of each well shall be the maximum sustainable daily volume which said well is physically and legally capable of delivering into Buyer's pipeline connection to said well, or the maximum daily volume which the well operator elects to make available for delivery into Buyer's pipeline, whichever daily volume is smaller. Gas Purchase Contract at Art. IV, ¶ 4.1(A) & (2).

Putting aside or without reference to the effect of the language concerning the "maximum daily volume which the well operator elects to make available," such a construction of this language would lead to the absurd result that the buyer's minimum take or pay obligation could be measured by the maximum volume the well could physically and legally produce on one day, even if that day was the *only* day of the accounting year that the well could in fact physically and legally produce, times the number of days in the accounting year. Use of the word "sustainable", which is ambiguous in context, does not, in the Court's view, cure this problem. If a test could be done to demonstrate that the well was physically capable of producing a certain maximum per day for at least one year, this theoretical may not in actuality occur, again with the possibility of the absurd result that the buyer could be obligat-

ed to take or pay for the theoretical daily maximum for the entire accounting year even if the well could not physically produce for one day of that year.

The language of the contract alone does not govern its interpretation it if involves an absurdity. *See* Okla.Stat. tit. 15, § 154. More importantly, in construing a contract a court must consider it as a whole "so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context." *Mercury Investment Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 529 (Okla.1985). Each clause should aid in interpreting the other clauses. *See* Okla.Stat. title 15, § 157. In this case, when the above-quoted language is considered in conjunction with other language in Article IV, setting forth the parties' basic agreement that "Seller agrees to deliver and Buyer agrees to take or pay for *if tendered* and not taken ... certain volumes of gas," Gas Purchase Contract, Art. IV, ¶ 4.1 (emphasis added) and language in Article IV which introduces and modifies the contract formulae by explaining that those formulae are to determine "[s]uch volumes of gas required to be taken or paid for *if tendered* and not taken," *id* (emphasis added), it is clear that the parties intended that the buyer would not be obligated to take or pay for gas when the seller did not in fact tender it and/or when the well could not physically produce or deliver into the buyer's pipeline. Since the seller *could not* have tendered gas when the well was in fact physically incapable of producing or delivering into the Buyer's pipeline, it is clear that the calculation of the volume described in paragraph 4.1A(2) of the contract, quoted above, must take into account days when the well was in fact physically incapable of producing. Thus, evidence submitted by Defendant creates material issues of fact concerning the amount of Plaintiff's damages.

Finally, the Court takes judicial notice of Section 29 of Title 52 of the Oklahoma Statutes and Oklahoma Corporation Commission Oil and Gas Rule 2–331 (effective in 1982 and 1983) and observes that Plaintiff's calculations for those contract years do not appear to take into account the limitation on the production of a well's daily natural flow prescribed by that statute and rule.

## Conclusion

Plaintiff's motion for partial summary judgment on Defendant's affirmative defenses of force majeure, commercial impracticability, impossibility of performance, frustration of purpose, release and the statute of limitations is granted. Likewise, Plaintiff's motion directed to Defendant's public policy-based and conservation law-based defenses and Defendant's "affirmative defenses" based on its assertions that the payment obligations are penalties or liquidated damages provisions and that enforcement of the payment provision constitutes the allegedly unavailable remedy of specific performance is granted. Plaintiff's motion for summary judgment on Defendant's counterclaims for reformation and rescission is granted. Plaintiff's motion for partial summary judgment on the issue of damages for the years 1982, 1983, 1985, 1986 and 1987 is denied.

IT IS SO ORDERED.